GEORGE DONNER *v.* CYRUS PALMER, CHARLES A. HAWLEY, DAVID N. HAWLEY, W. A. PALMER, OLIVER W. SPENCER, AND G. B. BRADFORD.

ALCALDES' GRANTS.—Alcaldes' grants of lots in pueblos in California made while the Spanish or Mexican laws were in force, were required to be first entered in a book to be kept by the Alcaldes for that purpose, and then to be signed and attested by the proper officer. A copy or summary statement of the proceedings as contained in this book, also signed and attested by the proper officer, was then to be given to the grantee as evidence of his title.

IDEM.—The record of such grants so kept in this book became an official record of the same, and primary evidence of the facts recited therein. Such record is not secondary evidence, subordinate to the certified copy of the same, to be given to the grantee, and if any distinction as evidence exists between the record in the book and the certified copy, the higher degree or rank must be accorded to the record in the book.

IDEM.—To entitle such record of a grant to be received in evidence it is not necessary to produce or prove the loss of the certified copy of the same given to the grantee.

IDEM.—The fact that such official record of Alcaldes' grants was not kept by American Alcaldes strictly in accordance with the regulations of the King of Spain made in 1789, called the "Plan of Pitic," does not make them secondary evidence, for it is either primary evidence or of no value whatever as evidence.

BOOK "A" OF ALCALDES' GRANTS IN SAN FRANCISCO.—Whenever Book "A" of original Alcaldes' grants made by American Alcaldes in San Francisco contains a full copy of the paper delivered to the grantee, with the genuine signature of the Alcalde appended thereto, it was kept substantially according to the regulations of the King of Spain, and is an official record and primary evidence.

IDEM.—Whenever said Book "A" does not contain a full copy of the paper delivered to the grantee, but a summary of the proceedings sufficient to show an application for a grant, and that a grant was made, over the genuine signature of

the Alcalde, these entries are also an official record and primary evidence of the grant to which they refer.

DELIVERY OF ALCALDE'S GRANT.—When an entry of a grant made by an Alcalde was duly entered in the book of official records, attested by his signature, a delivery of the same, or a copy thereof, was not necessary in order to give effect to the grant and vest the title in the grantee.

DELIVERY OF CONVEYANCE BY GOVERNMENT.—Delivery as applied to private conveyances has no application to grants made by the Government, evidenced either by an Alcalde's grant or a patent.

ON WHAT A DECISION IS AUTHORITY.—When counsel in the argument of a case assume a certain principle advanced by them as correct law, and the Court decides the case upon the assumption thus made by counsel, without discussing the correctness of this assumption, the opinion is not authority that such assumption is correct law.

PAYMENT FOR ALCALDE'S GRANT.—Alcalde's grants were intended to be gifts, and not sales, and when the grantee was required to pay a municipal tax or fee, its payment was not a condition precedent to the exercise of the granting power, nor did a failure to pay it defeat or invalidate the grant.

GRANT TO INFANT.—An Alcalde's grant to an infant was valid, and the infant could take and hold under the grant.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

This was an action to recover possession of an undivided three fourths interest in One Hundred Vara Lot Number Thirty-Nine, in the City of San Francisco, commenced April 8th, 1861.

The complaint alleged that on July 19th, 1847, George Hyde, then Alcalde of the Pueblo of San Francisco, now the city of that name, granted the lot in question to the plaintiff, who was then an infant of the age of ten years; that the grant was delivered to one McDonald, then acting as guardian of the plaintiff, for the use and benefit of the plaintiff, whereby he became seized in fee of the lot. The answer denied the making of the grant and seizin of the plaintiff.

The plaintiff on the trial produced a book, labelled "Book A of Original Grants," taken from the office of the Recorder of the City and County of San Francisco, and after having proved that it had been kept for a number of years in said office, introduced as a witness George Hyde, who testified that he was Alcalde in the Pueblo of San Francisco in 1847, and that the book produced was "Book A of Original Grants,"

and was kept in his office while he was such Alcalde, and that it contained a record of original grants made by him while he was Alcalde. Plaintiff then offered in evidence an entry in the book, of which the following is a copy:

"Lot No. 39.

"Whereas, George Donner has presented a petition soliciting for the grant of a title to a lot of ground as therein described, therefore I, the undersigned, Alcalde, do hereby give, grant, and convey unto the said George Donner, his heirs and assigns forever, Lot No. 39, containing 100 varas square, in the vicinity of the Town of San Francisco, subject to all the rules and regulations governing in such cases.

"In testimony whereof, I have hereunto set my hand as Alcalde, this 19th day of July, A. D. 1847.

"GEORGE HYDE, First Alcalde."

The offer was accompanied by proof that the heading "Lot No. 39," and the signature were in the handwriting of Hyde, and the remainder in the handwriting of his Clerk, and that the entry was made about the time it purported to be. It also appeared from the testimony of Mr. Hyde that his signature to the entry might have been affixed after the 19th of July, 1847, and possibly not before the 1st of September following.

There was a municipal fee or tax of twenty-five dollars required to be paid by the grantee of the lot, and it did not appear from the testimony that this fee was ever paid. No grant of the lot was produced, except the entry contained in Book "A," nor was any effort made to show that such grant if it ever existed was lost. There was no positive proof of the delivery of any grant to Donner or his guardian, but it was the impression of Mr. Hyde, the Alcalde, from his general custom of transacting business, that such delivery was made.

The defendants, by their attorneys, objected to the evidence, upon the ground that it was not primary or the best evidence of any grant having been made or delivered to George Don-

ner, and that at best it was but secondary evidence, and that there had been no testimony to lay the foundation for the introduction of this secondary evidence, as the loss or destruction of the original instrument of which the entry in Book " A " was a mere memorandum, had not been shown. They also objected further that the entry in Book " A " was a mere memorandum, and not a full history of the proceedings, and was only indicative that there was some other instrument which had to be executed and delivered, and which was primary evidence in the case. The Court overruled the objections, and defendants, by their attorneys, excepted.

After the testimony was closed, the defendants moved a series of instructions to the jury, some of which were given and others refused. Those refused were as follows:

" 1st. The Alcalde was not the proprietor of the municipal lands, and could only grant lots, or portions thereof, by virtue of power derived from the laws and regulations on the subject ; the exercise of that power was limited and restricted by certain conditions which he had no authority to waive or dispense with ; if he undertook to grant the lot without the payment of the municipal fee, his act was void ; so of a grant made to a person legally incapable of performing the conditions.

" 2d. Infants were incapable of binding themselves to perform the conditions upon which grants of municipal lands were made by Alcaldes, and were therefore incapable of receiving grants.

" 3d. In case of a grant under a power, the regularity of the whole proceedings is to be made out as a part of the purchaser's title ; if irregular, the grantee takes nothing by it. In granting lots of pueblo land, the Alcalde acted under a mere power ; and the payment of the municipal fee was an indispensable prerequisite to the exercise of such power. Unless, therefore, you find from the evidence that the fee of twenty-five dollars was paid for the one hundred vara lot in question, the alleged grant was void for want of power, and your verdict should be for defendants."

To the refusal of the Court to give the foregoing instructions exception was taken.

In addition to the instructions given at the request of the defendants, the Court also of its own motion further instructed the jury as follows:

" If you find from the proofs that George Hyde, on the 19th day of July, 1847, was the Acting Alcalde of the Town of Yerba Buena, now City of San Francisco, and that in his official capacity as such Alcalde, he made a grant to the plaintiff of the lot in question, and evidenced said grant by entering, recording, and certifying the same over his genuine signature, as such Alcalde, in a book of entries and records of town grants, officially kept at the time in the Alcalde's office for that purpose, you may not only presume a previous application by the plaintiff or some one for him for such grant, but in addition you may presume the same was made and duly delivered, unless the evidence satisfies you to the contrary. In case of such making and delivery the plaintiff will be entitled to recover.   But if you do not find the making and delivery of such grant in the manner before stated, then your verdict will be for the defendants."

To this charge, except what is contained in the last two sentences, the defendants, by their attorneys, also excepted.

The plaintiff had judgment, and the defendants appealed from the judgment and from an order denying a new trial.

*E. W. F. Sloan,* for Appellants, argued that the charge presupposed the making and delivery of a grant as distinct from the entry in Book " A," and to that extent was free from error; yet it was to the same extent in conflict with the previous ruling of the Court in allowing the entry to be read in evidence without any proof of the loss of the supposed grant; and that nothing could justify the ruling of the Court in admitting the entry in Book " A," except the assumption that it was itself the *grant,* and transmitted the title from the pueblo to the respondent.   He also argued that the charge

advanced an erroneous view touching the powers of the
Alcalde, as that officer was not the proprietor of pueblo
lands, and that in granting lots he exercised delegated power
only, and could not dispense with any condition imposed by
law, and could not make a valid grant without the payment
of the municipal fee or tax; and cited *The State* v. *Lawson,*
14 Ark. 121; *Dickerson* v. *Gilleland,* 1 Cow. 498; *The United
States* v. *Boyd,* 5 How., U. S., 49; *Bixler* v. *Baker,* 4 Binn.
219; *Jackson* v. *Shepard,* 7 Cow. 90; *Stead's Executors* v.
*Course,* 4 Cranch, 413; *Parker* v. *Rule's Lessee,* 9 Cranch, 67;
and *Hart* v. *Burnett,* 15 Cal. 584.

*S. O. Houghton,* for Respondent, argued that the regulations
known as the "Plan of Pitic," promulgated on the 14th of
November, 1789, by the King of Spain, required Alcaldes to
keep a book of grants, the entries in which, by virtue of these
regulations, became an official record and authentic public
instruments, and that the person who presented an authentic
public instrument was not obliged to prove the instrument,
but the person who alleged it to be false must prove his alle-
gations, and that in that respect public instruments differed
from private conveyances, the genuineness of which must be
proved by the person offering them in evidence; and cited
Escriche, Title Instrumento Publico, §11; *Gregory* v. *Mc-
Pherson,* 13 Cal. 573; *Patterson* v. *Winn,* 5 Peters, 234.   He
also argued that the record of a grant by the Government,
signed by the proper officer, was original evidence, and was
entitled to full credit, proof having been made that it was
produced from the proper official custody, and that such
record did not certainly occupy an inferior grade as evidence
to an exemplification; and referred particularly to the argu-
ment of Mr. Wilde, in *Patterson* v. *Winn,* 5 Pet. 238; and
that the entry in Book "A" was not a copy in any sense,
and if not *the original,* was at least a duplicate original.   He
also argued that under the Spanish laws no delivery of the
grant was necessary, and that the question of delivery never

had any application to grants of land made by the Government; and cited *Marbury* v. *Madison,* 1 Cranch, 137 : *Lott* v. *Proudhomme,* 3 Rob. La. 293 ; and 8 Cranch, 246. He further argued that the Alcalde, being clothed with power to dispose of the lot, and having, in making the grant, acted in an official capacity, was presumed to have acted within the sphere of his duties, and that the grant was *prima facie* evidence that all the prerequisites of the law in relation to municipal fees, etc., had been complied with ; and cited *Strother* v. *Lucas,* 12 Pet: 437 ; and 9 Cranch, 102.

*John W. Dwinelle,* also for Respondent. By the original Spanish law authorizing grants of pueblo lands, the entry of the grant made in the official book kept in the archives of the pueblo constituted the original grant, and any paper delivered on that occasion to the grantee, constituted only secondary evidence. The original law under which the distribution of pueblo lands was made by Alcaldes, Ayuntamientos, and Justices of the Peace, under the Spanish and Mexican dominion, was that established by the celebrated "Plan of Pitic." (Respecting this plan, see *Hart* v. *Burnett,* 15 Cal. 530 ; Dwinelle's Colonial History of San Francisco, Secs. 40–43 ; and the Plan itself, in the Addenda to that History, page 11, No. VII.) It was the original proceeding entered in Book " A " which conveyed the title to the grantee, and the paper delivered to him was not an original grant, but only a certificate that a grant had been made. Whether the original Spanish law by which the original grant was made in the book kept in the archives had been changed or not, was a question for the jury, and was properly left to the jury in this case. The written law having been shown to exist, and no written abrogation or change of that law being shown, the Judge was bound as of course to receive the original record made by the Alcalde in his "archived book " and signed by him, as an original grant, and permit it to go to the jury. The Judge, therefore, decided rightly in refusing to strike out the record of the grant in Book " A," or to nonsuit the plaintiff. (See

Escriche Derecho Español, 23–24 ; *Von Smith* v. *Huntingdon*, 1 Cal. 64 ; *Panaud* v. *Jones*, 1 Cal. 500 ; *Tevis* v. *Peters*, 10 Cal. 477 ; *Adams* v. *Norris*, 23 How. U. S. 353.)   An infant is not bound by his contracts, but he may still fulfil them, and thus derive all possible benefit from their performance.   But an onerous condition in a grant of municipal lands is at most only a condition subsequent.   Probably, in view of the evidence in this case, even the non-performance of the conditions subsequent would only subject the land to be forfeited ; but the discussion of that point does not enter into this case.   The " Plan of Pitic," cited, *ut supra*, provides that. a lot shall be given to each " settler," without any restriction as to infants. Will it be pretended that an infant orphan boy, who is a *possible* man, is not a settler, within the scope of this plan ? The payment of the municipal fee was not a prerequisite to the vesting of title, as the imposition of this tax was a plan of ways and means to raise municipal funds, and probably like the fine formerly levied under the English law upon the alienation of land, constituting neither a condition precedent nor subsequent.

*S. M. Wilson*, for Appellants, in reply.   The counsel for respondent have overlooked the Acts of the Mexican Congress of 1824, and the regulations of 1828, which abrogated the " Plan of Pitic," and introduced a new scheme and plan, and ever since their adoption, all grants have been made under them.   (*U. S.* v. *Vallejo*, 1 Black. 541 ; and *U. S.* v. *Workman*, 1 Wall. 762.)   Pueblo grants are as much a part of the colonization scheme as grants of ranchos, and the policy and mode of action indicated in and deducible from those laws are to be regarded as well in determining questions on pueblo or Alcalde grants, as grants of ranchos.   (*U. S.* v. *Larkin*, 18 How. U. S. 563 ; *Hart* v. *Burnett*, 15 Cal. 549.)   That the entry in Book " A " was only secondary, and not primary evidence, is settled in *Rice* v. *Cunningham*, 29 Cal. 492.   George Donner, being an infant, was incapable of taking and holding the lot.   The grant was a contract, and the grantee made promises himself.   An infant could not bind himself.

By the Court, SANDERSON, J.:

I. Whether the first exception was well taken or not depends upon the rank as evidence assigned by the Mexican law, which was then in force, to the entry in "Book A of Original Grants."

By the instructions approved by the King of Spain, and made for the purpose of establishing the Town of Pitic, in the Province of Sonora, and directed to be adopted and followed in establishing other new settlements, promulgated on the 14th of November, 1789, a record of the proceedings of the public functionaries authorized to make grants of town lots to settlers was required to be kept and preserved in the archives of the settlement. Of these instructions the seventeenth section is to the following effect:

"SECTION 17. The Commissioner in whose charge shall be the new settlement and the distribution of lands and town lots, shall make a book or register in which shall appear the original proceedings (*las diligencias originales*) that were taken, which book shall be kept in the archives of the Ayuntamiento of the new settlement; and an attestation or certificate of these proceedings shall be given to each settler, which shall explain with brevity, distinctness and clearness the extent and boundaries of the building lots and sowing lots which he may have assigned to them respectively; which instrument shall serve them as written evidence of proprietorship for themselves, their children and descendants, warning them that for this purpose they shall keep it, and that if they were to lose it by some unintentional accident they may have recourse to the Commissioner or to the Ayuntamiento to give them another like copy of the proceedings, which for this purpose shall remain archived."—(Dwinelle's Colonial History of San Francisco—Addenda, p. 11.)

In view of this language there can be no doubt as to the mode in which grants of town lots were to be made. The

entire proceedings were to be first entered in the official book required to be kept for that purpose, signed and attested in due form by the proper officer. A copy or summary statement of the proceedings as contained in the official book, also duly signed and attested by the proper officer, was then to be given to the grantee as evidence of his title, and in the event of its loss the officer in whose official custody the book might be at the time was authorized and required to give him " another like copy " of the original proceedings.

The record so kept became an official and public record of the transactions of the Alcaldes in the matter of granting town lots, and, as such, primary evidence of the acts there recited under any system of law with which we are acquainted. Entries in such a book, if made in conformity with the regulations of the 14th of November, 1789, became, under the Mexican law, what is denominated an authentic instrument ; that is to say, an instrument which proves itself, and, under the common law, an official record. Under both systems such entries have always been esteemed the highest and most satisfactory evidence of the facts which they recite, because they are made by the direction of the law and are of public concern, and because they are made under the sanction of an oath, or, at least, of official duty, and made at or about the time the acts which they recite transpired. They are retained in the custody of the functionary or department by which they are required to be kept, and are so retained for the express purpose of making them permanent and primary evidence of the transactions of the Government. (1 Greenl. on Ev., Sec. 483 *et sequens.*) Such a record can under no circumstance be called secondary or subordinate evidence, for there is and can be, from the very nature of the case, no higher evidence of the facts which it recites. " Book A of Original Grants," if kept in conformity with law, is not, as evidence, subordinate to the paper which was given to the grantee. The most that can be claimed for the latter is an equality of rank, because it, too, bears the official stamp. If, however, any distinction can be drawn between them on the score of rank, the higher

degree must be accorded to the record, because it contains the first and more formal and complete instrument, denominated in Mexican law the " Matrix," so called because it is the original from which copies may be drawn.

This question arose in the case of *Gregory* v. *McPherson*, 13 Cal. 570. It is true that it arose in relation to a grant made by the Governor, but we apprehend, for the reasons already suggested, that no distinction can be made between grants of that character and those made by Alcaldes. On the score of being official or authentic documents, which is the ground of their admission as evidence, they stand on a level. In that case a certified copy of the grant signed by the Governor and countersigned by the Secretary of State, annexed to and forming a part of the *expediente*, in the archives of the Government, was offered in evidence, and one question was, whether the copy in the archives of the Government was to be regarded as primary or secondary evidence. Upon this question the Court said : " We are at a loss to know upon what ground such a document can be denied the weight of original evidence. It was made and signed and authenticated as a record by public officers in the discharge of public duties. The papers were retained in the custody . of appropriate public officers, for the purpose of proof—and the highest and most authentic proof—of their own action. The documents receive the stamp—and the most satisfactory stamp—of official authenticity. The signatures are made on it as on the paper sent out by the department. We cannot see why such papers should be called copies, or why, in the scale of proofs, they should stand in any subordinate relation to the paper handed to the grantee. If not counterparts or duplicates it would seem that the original paper is the record retained by the department as a part of its permanent records."

In *Downer* v. *Smith*, 24 Cal. 114, a book entitled " Book No. 3," being the official record of grants made by the Alcaldes of the Pueblo de San José de Guadalupe was offered in evidence under the same circumstances and for the same purpose for which " Book A of Original Grants " was offered

in this case, and we held that it was a book of original grants and therefore entitled to admission as evidence upon that ground, as well as upon the further ground that it was declared to be competent evidence under the provisions of an Act to legalize certain records in the Recorder's Office of the County of Santa Clara, of which "Book No. 3" was one. ·

That such is the rule does not seem to be seriously contested by counsel for appellants, but it is claimed that the official character of "Book A of Original Grants" is successfully impeached by the testimony in the case in relation to the manner in which it was kept.

We agree with counsel that the testimony shows that the book was not kept in all respects strictly according to the regulations of the 14th of November, 1789. The reason why it was not is doubtless owing to the fact that the Alcaldes by whom it was kept, being citizens of the United States, were ignorant of the mode in which it was directed to be kept under the Mexican domination. Hence, guided by their knowledge of our system of private conveyancing and registration, they regarded the book as standing in the same relation to the paper delivered to the grantee in which the Register of Deeds in the office of a County Recorder stands to the conveyance therein recorded. They did not therefore in all cases enter the entire proceedings in the book and authenticate them in the manner intended by the regulations of 1789, but the first or original proceedings, so to speak, were delivered to the grantee and a copy or brief summary thereof entered in the book.

In view of this change, how stands the case? Does it follow, as contended by counsel for appellants, that the record of the Alcalde has become merely secondary evidence? Upon what principle can such a result be affirmed? It can only be upon the ground that it thereby ceased to be an official record of the transactions which it commemorates. But in that case, unfortunately for the argument, it does not become secondary evidence; on the contrary, in its fall it does not lodge at that point, but drops entirely out of sight. It ceases to be of any

value whatever as evidence, and can only serve as a memorandum to refresh the memory of the Alcalde or his Clerk. The question, then, is—Is Book A to be regarded as an official record, notwithstanding the innovations of the American Alcaldes? If it is, the consequence necessarily follows that it is primary evidence, as we have already seen, simply because it is an official record.

As a matter of fact, aside from any rule of law, Book A is the record, and the only record, which was kept by the Alcaldes of San Francisco after the acquisition of the country by the United States. It is in that sense the foundation of a vast number of titles, and is of vast importance as evidence, if it can be regarded as evidence at all. Under such circumstances it ought not to be discarded as unofficial, and therefore worthless as evidence, except for the most cogent reasons.

Wherever Book A, as it sometimes does, contains a full copy of the paper which was delivered to the grantee, with the genuine signature of the Alcalde appended, there can be no good reason for holding that it has not been kept so far substantially in the manner required by the regulations of 1789. The mere fact that the entry may have been made after instead of before the paper which was delivered to the grantee would not vitiate the record as evidence, for the fact is an immaterial one, and performs no part in establishing the legal character of the entry. It is the fact that the entry is there, over the signature of the proper officer, upon which the authenticity of the entry depends under the regulations of 1789. Wherever, therefore, the entry is of the character under consideration we think it is official within the intent and meaning of those regulations, and therefore primary evidence of the grant which it recites.

Book A contains another class of entries, which do not contain a full statement of all the proceedings, but a summary of them sufficient to show that an application for a grant was made, and a grant made, and are made over the genuine signature of the Alcalde. The entry in this case belongs to this class. It is attested by the genuine signature

of the Alcalde, and, so far as it goes, is therefore authenti-
cated in the mode prescribed by the regulations of 1789.
Shall it be denied the character of an official entry merely
because it is not so full as it might have been—especially in
view of the importance of it and the peculiar circumstances
through which it falls short of what it ought to have been—
and the further fact that it is unaccompanied by any suspicion
of fraud? We think not. We think that such entries sub-
stantially accomplish the object of the regulations of 1789,
in requiring a record book to be kept, and that they ought to
be upheld by the Courts as official entries within the spirit of
those regulations, and therefore primary evidence of the
grants to which they refer.

Some stress is placed by counsel for appellants upon the
fact that there is no proof, as they claim, of a delivery of the
grant as alleged in the complaint, and we deem it proper to
say what we have to say upon that subject in this connection.

We hold that the grant in this case was made in a manner
not fatally repugnant to the regulations of 1789. Under
those regulations there could be no delivery of the grant as
entered in Book A. The only thing to be delivered was a
copy, or if you please, an alias original, which was not given
to the grantee in the sense in which we speak of the delivery
of a private conveyance. It was not delivered to him because
its delivery was necessary in order to give effect to the grant
and vest in him the title to the lot. It was given to him
merely in testimony of his right under the grant. We do not
understand that the doctrine of delivery as applied by us to
private conveyances has any application to grants made by
the Government, either under the Mexican system or our own.
We so intimated in *Downer* v. *Smith, supra*. We understand
that the title under the grant vests the moment it has received
the stamp of the last act required to completely authenticate
the instrument, and that a delivery is not necessary. (*Mar-
bury* v. *Madison*, 1 Cranch, 137 ; *Lott* v. *Proudhomme*, 3 Rob.
La. R. 293 ; *Lavergne's Heirs* v. *Elkins' Heirs*, 17 La. R. 226.)

Suppose from any cause, after the entry in proper form of the proceedings in the book kept by the Alcalde, he should fail to deliver the paper to which the grantee is entitled under the regulations of 1789, could it be claimed with any show of reason that thereby the grant was defeated or made inoperative or void? We think not. If not, it follows that no delivery of such a paper need be shown.

In *Lott* v. *Proudhomme, supra*, a patent was issued by the General Land Office and sent to the Register of the Land Office in Louisiana. Subsequently the Commissioner of the General Land Office directed the Register not to deliver the patent, and it was accordingly withheld. Nevertheless, the patentee brought ejectment upon it, and on the foregoing state of facts the Supreme Court of Louisiana (Mr. Justice Bullar) said: "Even admitting the right of the Commissioner of the General Land Office to cancel an entry and sale of public lands before the issuing of the patent, yet the moment the patent has passed the great seal it is beyond the power of the officers of the Government. It is true the instrument in this case has been withheld, but we conceive that mere possession of the parchment does not affect the right of the patentee." So it was held that a delivery of the patent was not necessary in order to vest the title in the patentee.

To the like effect is the case of *Lavergne's Heirs* v. *Elkins' Heirs, supra*. In proof of title the plaintiffs produced the books of Spanish grants from the Land Office in New Orleans, in which was recorded a grant to their ancestors by the Governor of Louisiana. The grant was unsigned, yet the Court held it to be sufficient evidence of title in the plaintiffs. The cases of *Enfield* v. *Permit*, 8 N. H. 512, and the *Proprietors of Enfield* v. *Day*, 1 N. H. 520, are also to the like effect.

The claim of the appellants that the points which we have thus far considered have been determined in their favor in *Rice* v. *Cunningham*, 29 Cal. 492, is without any substantial foundation. In that case the foregoing points were neither made nor argued. There is a marked difference between this case and that. The entry of the Kittleman grant in Book A was

not signed by the Alcalde in his own handwriting, but in the handwriting of Dunleavy, his clerk, and therefore not attested according to the instructions of 1789. For this reason, or some other, counsel for the plaintiff elected to treat the entry as only secondary evidence. To this view counsel on the other side could have no objection. Accordingly a foundation was laid for its introduction as secondary evidence, and it was offered as such. Under these circumstances it became a matter of no moment whether it came in as primary or secondary. Over that question there was no contest. Upon that branch of the case the controversy was confined to the question whether the plaintiff was bound to exhibit the entry to the jury as it appeared in the book. The entry had been cancelled by lines drawn across the body of the entry and the words " not taken " written in the margin. Counsel for the plaintiff claimed that they were entitled to use the entry without the marks and words of cancellation, alleging that they had been put there in fraud of the plaintiff's rights, while the contrary was contended for by the other side. It was therefore entirely unnecessary for the purposes of the case that we should adopt a different theory. The real points of controversy could be settled upon the theory adopted by counsel, as well as upon any other. So we followed the lead of counsel and assumed for the purposes of our opinion, as they had for the purposes of the trial, that the entry in Book A was only secondary evidence of the grant upon which the plaintiff relied for a recovery. The only ground for saying that the case is in point is as here represented—a mere inference that so and so is the case because it is so assumed for the sake of the argument. Neither Courts nor counsel are bound by conditions which are merely assumed *arguendo.* To have gone outside of the case as presented by counsel and discuss a point not at all necessary to the purpose would have been to erect a windmill merely for the pleasure of running a tilt against it ; for nothing could have been said upon the question which would not have been strictly *obiter.*

II. The only points made upon the exceptions to the

instructions of the Court, not in effect already noticed, relate to the municipal tax and the infancy of the plaintiff at the time the grant was made.

(*a*) It has never been held, so far as we are advised, that the payment of the municipal tax by the grantee was a condition precedent to the exercise of the granting power. No such condition is imposed by the regulations of 1789, nor by any other to which our attention has been called. The grant was intended to be a gift, and not a sale, made for the purpose of encouraging new settlements. The money paid by the grantee was a tax or fee and not a price for the lot. The power was long exercised, so far as we are advised, before the tax was imposed, and when it was imposed we do not understand that it was intended to restrict in any sense the granting power as it had previously existed, but merely to authorize the Ayuntamientos to make a charge for the grant in the nature of a fee or tax, for the purpose of municipal revenue, not differing in any respect from other municipal fees or taxes. The tax was not heard of until nearly half a century after the Plan of Pitic was promulgated. It is first mentioned in the decree of Governor Figueroa of the 6th of August, 1834, (Dwinelle's Colonial History of San Francisco, Addenda, p. 29,) which is entitled " A plan of ways and means to raise municipal funds for the Ayuntamientos of the Territory of Upper California." In keeping with its title, the decree proceeds to establish a system of taxation and provides what shall be taxed and how much. The third on the list is " concessions for building lots," and the Ayuntamientos are instructed to tax each concession a certain amount, according to the size of the lot. By the fourth item the Ayuntamientos are authorized to charge a dollar and a half for the use of such branding irons as may be filed for registration, and collect the same at the time of registration. By the sixth item they are authorized to charge the owner half a real for each head of cattle or sheep and two reals for each hog or pig slaughtered for the public supply or market. So on to the end.

Now, suppose the officer whose business it was to register

the branding irons should fail to collect the fee or tax, would the registry thereby become null and void for the uses and purposes, whatever they may have been, for which it was intended ?   Or suppose an owner of cattle, sheep or hogs should slaughter one of them for the public supply or market without having first paid the tax, would the steer, sheep or hog, if sold to customers, be any the less their meat ?

In many counties of this State the county officials are paid salaries for their services, but are required to charge certain fees and pay the same over to the County Treasurer for the use of the Government.   Now suppose a Recorder should record a deed without charging and collecting the fee therefor, would the record thereby become as if it were not and fail to impart constructive notice to subsequent purchasers and encumbrancers ?   Or suppose the Clerk should enter a cause upon the docket without having collected the docket tax levied for the purpose of paying in part the Judge's salary, would the action become no action and the judgment void and of no account for any purpose ?   We apprehend not.   No distinction can be made between the case in hand and those referred to in illustration.   They stand upon the same level, and the payment of the tax or fee for the concession of a house lot is no more a condition precedent than the payment of either of the others, and its non-payment did not operate to defeat the grant.

That such was the understanding of the Mexican officials before the conquest of the country by the United States is shown by a reference to the schedule of grants made by the municipal authorities of San Francisco between the years 1835 and 1846, and the accounts of Fuller, Syndic of San Francisco, between the years 1839 and 1842, (Dwinelle's Colonial History, Addenda, p. 75–113,) where it appears that grants were made and the tax collected afterwards the same as in the case of other municipal taxes.

We are satisfied that the payment of the tax was a matter of no consequence so far as the validity of the grant was concerned, and that the plaintiff was not bound to prove that it

was paid, nor were the defendants entitled to prove that it was not.

(b) The only reason urged in support of the proposition that the plaintiff, being an infant, could not take under the grant, is that it was not the policy of the Mexican Government to make grants of town lots to infants, because they were incapable in law of taking upon themselves the performance of conditions subsequent.

We do not deem it necessary at this late day to go into a critical examination of what the policy of the Mexican Government in this matter was, or whether that policy would or would not have been subserved by making grants of town lots to infants. We know that the Mexican nation did make grants of land to infants in other cases, and we know of no positive prohibition in cases like the present. Concede the incapacity of infants to make binding contracts, it does not follow that they could not or would not perform them. They might perform the conditions themselves, or others might. The only consequence of a non-performance was a possible forfeiture of the estate. Even adults were not bound to perform them in the sense that they could be made to do so. It was a matter resting entirely with themselves whether they would improve the lot or not. They might or might not; and so might an infant. If not, the Government had its remedy by denouncement in the latter case as well as the former.

Judgment and order denying a new trial affirmed.

Mr. Justice SHAFTER, being disqualified, did not participate.


SAWYER, J., concurring specially :

I agree with my associates in holding that the entry in "Book A of Original Grants" is primary, and not secondary evidence, in the sense of the rule relating to the subject. It is not a copy, and does not purport to be a copy, of any act or instrument between private parties, but is an

official record of the acts of a public officer—of his own acts—
made by him in the performance of his ordinary public duties.
It is as clearly a record as the book of accounts kept under
the direction of the same officer, held to be admissible in evi-
dence in *Kyburg* v. *Perkins*, 6 Cal. 674. The fact that the
Alcalde, in making grants, also issued and delivered to the
grantee a more formal instrument, which was regarded as the
grant, does not affect the character as original evidence of
official entries like the one in question. But, in my judg-
ment, for the purposes of this decision, it is not necessary to
hold—and I am not prepared to take the extreme view—that
the entry in question is the grant, and that, as such, by virtue
thereof the title vested the moment the entry was completed
and signed in the book, without delivery of any document to
the grantee, or further act on his part, or on the part of the
Alcalde. If it were necessary to so hold, I should be com-
pelled to dissent from the judgment. It is very clear to my
mind, from an inspection of the entry in question and the
other entries in the book, that it was not kept in the mode
prescribed by the instructions of the King of Spain of Novem-
ber 14th, 1789, usually known as the "Plan of Pitic." It
clearly appears by the evidence in this case, as it has also
appeared in many other cases before brought to this Court,
that, from the time of the conquest, the Alcaldes of San Fran-
cisco, who were appointed under the authority of the Govern-
ment of the United States, in practice, adopted and followed a
system which very materially modified the practice before
existing, if that practice was in accordance with the "Plan of
Pitic." This undoubtedly resulted from the fact that those
officers, and the inhabitants who immediately flocked in and
displaced or overwhelmed the old population, had been edu-
cated under an entirely different system, with different ideas,
and were wholly ignorant of the system of the civil law,
which system, in its details, was not merely not comprehended
by the newcomers, but was almost incomprehensible to them.
This departure from the Mexican law was not merely the mis-
take of an individual, but of a whole community; and it was

DONNER *v.* PALMER.

not confined to the making of grants by Alcaldes, but it extended to conveyances and many other transactions. The new inhabitants doubtless followed the Mexican usage, so far as they understood it, and substituted their own ideas where they did not. The idea entertained by the Alcaldes of San Francisco appointed subsequent to the conquest, was, that, not merely a registry of the fact of a grant having been made, but a delivery of a formal grant to the grantee, was necessary to constitute a grant and vest a title. They never for a moment supposed a grant took effect till an actual delivery. And their practice from the beginning was in accordance with this idea. The practice for a time was, when a grant was applied for, to make out the grant, sign it, make the entries upon the register, and deliver it to the Syndic to collect the fees, and, upon their payment, deliver the grant to the grantee. In case the petitioner declined to take it, or refused or neglected to pay the fees, the grant was destroyed, and the entry in "Book A" cancelled. In the practice adopted and pursued at San Francisco it was not at any period since the conquest intended by the Alcalde making the grant, that the grant should take effect until the delivery, nor was it supposed by them, or by the parties applying, that it did take effect, or that the transaction was complete till payment of the fees and actual delivery. The proceeding was intended to be, and was regarded by all parties, officers and people, as *in fieri,* and under the control of the Alcalde till payment and delivery; in other words, that there was no grant till the final act of delivery. The testimony shows that this was the practice, and that there are numerous instances of the cancellation by the Alcaldes of the entries of non-delivered grants, and the destruction of the instruments prepared for delivery, which had not been paid for and taken by the applicant. At times the Alcaldes would give public notice that grants thus prepared and entered must be taken out and the fees paid before a designated day, or they would be cancelled, and the cancellation took place in pursuance of these notices. There were some thirty or forty of these entries having the signature of

Hyde's predecessor—the grants corresponding to these entries having been turned over to Hyde by his predecessor—cancelled by him in this manner. And all this was done in pursuance of the intentions and practice of the Alcaldes, and the understanding of the people, that a grant would not become effectual, or vest any title till a delivery. Subsequent grants of the same lots to other parties were made upon the idea that the title still remained in the pueblo, and a large number of these lots situate in the heart of the City of San Francisco of the present value, doubtless, of several millions of dollars, are now held under such subsequent grants. If a title once vested by virtue of the entry and signature of the Alcalde, I do not perceive how it could be divested by a mere subsequent cancellation of the entry. To hold that a title vested the moment the entry was made and signed in "Book A," without a delivery, when such a result was not intended or contemplated by the granting power, or the parties interested, under the practice adopted, would be to overturn all these subsequent grants, and give the property in its present condition of enhanced value resulting from twenty years improvement and expansion of the city, to parties who never themselves claimed, or supposed they had, or were ever supposed by anybody else to have had, any title whatever. Nothing short of a positive law, clearly shown beyond reasonable doubt to be in full force, should be permitted to work such results. Conceding the effect claimed for a record of a grant made, and intended to be made, in strict accordance with the "Plan of Pitic," we have seen that this record, and the practice under which it was made, were not in accordance with that plan. The Mexican law yielded much more readily to the force of practice and custom than the common law. "In Mexican jurisprudence, as in that of other countries, custom is sometimes allowed not only to control, limit, modify and interpret the general rules of the system, but even to establish a rule in direct and palpable contravention of the positive written law. It is the teaching of the books that custom may attain the

66

force of law, not only where there is no law to the contrary, but when the effect of it is to overturn the previous law which stands in opposition to it—whence arises the maxim that there may be a custom without law, a custom contrary to law, and a custom according to law.—Escriche Derecho Español, 23, 24; Escriche, Dic., Title Costumbre; 1 Feb. Mej. 55 to 61." (*Von Schmidt* v. *Huntington*, 1 Cal. 64; *Panaud* v. *Jones*, Ib., 488; *Castro* v. *Castro*, 6 Cal. 160–61; *Tevis* v. *Pitcher*, 10 Cal. 477; see, also, *United States* v. *Fremont*, 17 How. 557.) I think it clearly appears in the case that there was a practice inaugurated in respect to the mode of granting and registering grants of lots in San Francisco different from that contemplated in the "Plan of Pitic" as early, at least, as the administration of the first Alcalde appointed under the authority of the United States, under which a grant was not deemed completed, so far as to vest a title in the grantee, till its delivery; and that this plan was thenceforward acted upon, and that it has been regarded as valid from that day to this. Undoubtedly, in point of fact, all subsequent grants down to and including the numerous grants made in pursuance of auction sales under Alcalde Geary went upon this theory—that is to say, the entire real estate of the City of San Francisco held under Alcalde grants, except the very few concessions made before the conquest, if any such exceptions there be, were granted under the practice, and under the idea, that the grant did not take effect until a delivery. At all events, upon the case disclosed by the record, we are not authorized to say that a valid custom to this effect had not so far grown up as to have the force of law. In *Rice* v. *Cunningham* the case was tried on the theory that a delivery was necessary to constitute a grant. This was the real question litigated in the Court below, and the Court so charged the jury; and the charge in this respect was not questioned on appeal. It is true that the entry of the grant in "Book A," in that case, was made by the Clerk, as was sometimes the case, and not signed by the Alcalde on the record, although his signature appeared to be copied into the record by

the Clerk.   But this was the only record there was, and the question litigated was as to the delivery.   I am not aware that it has ever before been seriously contended that the title vested under Alcalde grants in San Francisco, from the moment the entry in " Book A " was made and signed by the Alcalde, and before the delivery of the ,formal grant, of which a copy, or synopsis, as the case might be, constituted the entry.   The case of *Downer* v. *Smith* was decided upon a different state of facts, and different practice, which seems to have prevailed at San José, which was also recognized and aided by statutory provisions.   It has no application to this case.   With all deference to the opinion of my brethren, founded, as it is, upon a very careful and thorough examination of the question, I cannot concur in the view that this grant was substantially made and registered in pursuance of the " Plan of Pitic," or that it became a grant and vested a title as soon as the entry was made and signed by the Alcalde in " Book A," without the delivery of a corresponding title.   Under the views I entertain, it is unnecessary to determine this question ; but I do not feel at liberty, without indicating my dissent, to permit the announcement of a conclusion which, in my opinion, tends to a confiscation of, or, at the least, to unsettle the titles to, a large portion of the real estate in the City of San Francisco.

But the conclusion to which my mind is forced on the point discussed does not militate against the character of " Book A of Original Grants " as evidence.   It was still a public record of the official acts of the Alcalde.   It recorded the fact that he had, as Alcalde, made a grant.   It was a record of his own official action over his own signature.   It was not a copy of the act of some other party.   It was primary evidence or no evidence at all.   I think it properly admitted.

For the purposes of this decision I assume, as the District Judge did on the trial below, that, under the practice pursued at the time, a delivery was necessary to constitute a grant and pass a title.   The entry in Book A, as we have already seen, was properly admitted.   The evidence, I think, was sufficient

to justify the submission of the case to the jury.  The remaining questions arise on the instructions given and refused.  At the request of the defendant the Court instructed the jury as follows : " Unless therefore you are satisfied from the evidence before you that the grant was ·by the Alcalde executed and delivered to the plaintiff, or to some one for him, you should find for the defendant."  And again the Court of its own motion gave the following instruction : " If you find from the proofs that George Hyde, on the 19th day of July, 1847, was the Acting Alcalde of the Town of Yerba Buena, now City of San Francisco, and that in his official capacity as such Alcalde he made a grant to the plaintiff of the lot in question, and evidenced said grant by entering, recording and certifying the same over his genuine signature as such Alcalde, in a book of entries and records of town grants, officially kept at the time in the Alcalde's office for that purpose, you may not only presume a previous application by the plaintiff, or some one for him, for such grant, but in addition, further, you may presume the same was made and duly delivered, unless the evidence satisfies you to the contrary.  In case of such making and delivery, the plaintiff will be entitled to recover.  But if you do not find the making and delivery of such grants in manner before stated, then your verdict will be for the defendants."

The part of the charge complained of, is that portion, which, upon the facts assumed, says, an application may be presumed, and that " you may presume the same (the grant) was made and duly delivered, unless the evidence satisfies you to the contrary."  There was a clean entry in " Book A of Original Grants," signed by the Alcalde in person, showing that he had made a grant.  It was without any marks of cancellation upon it.  This, although, as I think, *under the system adopted, and then in use*, it did not constitute the grant itself, was an official record of the fact that a grant had been made.  There was evidence showing a practice of cancelling those entries made before the delivery of the grant, where the grant was, for any reason, as non-payment of fees, not delivered.  This was not cancelled in accordance with

such practice, but the record was passed over by the Alcalde making the entry to his successor, and finally transferred to the Recorder's office under subsequent statutes of the State of California as an authentic final public record of grants made.    The instruction was given with reference to the testimony in the case, and I think, unless there was other testimony to rebut the presumption, the jury were justified in presuming the record in the state in which it was presented to be a correct, complete and final record of the acts of the Alcalde with reference to this lot, and that the grant had been delivered.    There was other evidence given tending both to overthrow and support the presumption.    There was the evidence of Alcalde Hyde himself as to his recollection and practice—evidence on the question of payment of fees as bearing upon the question of probable delivery or non-delivery of this grant; and in this connection the evidence with reference to the payment of fees was, in my view, admissible. This evidence with reference to the delivery was submitted by the Court upon the question of delivery when the jury were told that they might presume a delivery from the facts assumed, if found proved, unless the evidence satisfied them to the contrary.    And, in immediate connection with this instruction, the jury were again told, that if they did not find a making and delivery of the grant, they must find for defendants.    Some criticism has been made by counsel for appellants upon the language of the instruction, tending to show that upon a critical analysis it is obscure and would tend to mislead the jury.    I do not think the jury could have misapprehended the idea designed to be conveyed, or that the charge as it would necessarily be understood is erroneous.    Perhaps something might have been properly and advantageously said upon the bearing of the other evidence on the question of delivery, but no instruction upon this part of the testimony was asked.    Although I have not attained this conclusion without some hesitation, I think there was no error in the instruction given.

The instructions asked by defendants and not given were properly refused for reasons stated in the leading opinion.

I concur in the judgment of affirmance.