## UNITED STATES *v.* SCHURZ.

1. The Supreme Court of the District of Columbia is authorized to issue the writ of *mandamus* as an original process in cases where, by the principles of the common law, the petitioner is entitled to it.

2. When a patent for a part of the public lands has been regularly signed, sealed, countersigned, and duly recorded, the patentee has a perfect right to the possession thereof.

3. In the progress of the proceedings to acquire, under the laws of the United States, a title to public land, the power of the Land Department over them ceases when the last official act necessary to transfer the title to the successful claimant has been performed.

4. Title by patent from the United States is title by record, and the delivery of the instrument to the patentee is not, as in a conveyance by a private person, essential to pass the title.

5. Therefore, when the officers whose action is rendered by the laws necessary to vest the title in the claimant have decided in his favor, and the patent to him has been duly signed, sealed, countersigned, and recorded, the title of the land passes to him, and the ministerial duty of delivering the instrument can be enforced by *mandamus*.

6. An acceptance of the grant will, in such case, be presumed from his efforts to secure the favorable action of the department, and especially from his demand for the possession of the patent.

ERROR to the Supreme Court of the District of Columbia.

This is a petition for a *mandamus*, filed in the Supreme Court of the District of Columbia, Oct. 11, 1879  It alleges that the relator, Thomas McBride, was, in 1862, possessed of all the qualifications necessary to entitle him to pre-empt one hundred and sixty acres of the public lands of the United States; that he, in that year, settled upon a tract of public land known as the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ and lots 1 and 2 of section 6, T. 3, S. of R. 5 W., situate in the county of Tooele and Territory of Utah, containing a little less than one hundred and sixty acres, with intent to appropriate it under the laws of the United States, and has continuously inhabited, occupied, and cultivated it; that he, May 31, 1869, in due form and time, made, at the land office in Salt Lake City, a homestead e. try of it; that he occupied, cultivated, and resided upon it for more than five years thereafter, and, June 15, 1874, made due proof thereof, paid the fees, and received a final certificate therefor; that his said proofs and papers were duly forwarded to the Commissioner of the General Land-Office, who found them to be in all respects in compliance with law, and such as to entitle the relator to a patent; that, in accordance with that finding, a patent for the tract was, Sept. 26, 1877, duly signed, sealed, and, by the Recorder of the General Land-Office, countersigned and recorded in the proper land records of the United States; that it was, Oct. 3, 1877, transmitted by the commissioner to the local land-officers at Salt Lake City, with instructions to deliver it to the relator, and was received by them; that he appeared at said land-office, and demanded of them to deliver the patent to him; that they refused to do so, because they had been instructed by the commissioner, Oct. 14, 1877, to return it; that it was so returned Oct. 22, 1878, and was then in the Department of the Interior, subject to the control of the Secretary of

the Interior; that Carl Schurz is such Secretary; and that the relator, Oct. 6, 1879, demanded of him, at his office in the Department of the Interior, the delivery of said patent, but the Secretary, on the tenth day of that month, absolutely refused to deliver it. The petition prays that the writ of *mandamus* issue, directing the Secretary to deliver the patent to the relator.

The relator, pursuant to leave of the court, filed, Oct. 21, 1879, a supplemental petition.

The Secretary filed his answer on the twenty-fourth day of that month, setting up that the lands claimed by the relator were, at the time of his entry, within the incorporated limits of the city of Grantsville; that, without knowledge by the register of the local land-office that the tract was within those limits, the entry was admitted; that in 1874 the relator made final proof thereof; that in February, 1877, the mayor and corporate authorities of Grantsville applied to the register to make entry of its town site under the act of March 2, 1867; that their application included the land in question; that upon his refusal to permit the entry while the land was included in that of McBride, application was made, Feb. 24, 1877, to have the entry cancelled, as illegally and improvidently allowed, which application was duly forwarded by the register to the Commissioner of the General Land-Office; that prior to regular action thereon a patent was prepared, in September, 1877, signed and sealed, and transmitted on the third of the following month to the register, for delivery to McBride upon the surrender of the duplicate receipt; that afterward, upon taking up the record of contest for examination, the commissioner, discovering that the patent had been improvidently prepared and transmitted, ordered its recall; that it was thereupon returned by the register, no demand having been made for its delivery at the date of the receipt of the commissioner's instructions; that, upon the examination of the record of contest, the claim of McBride to the land was rejected by the commissioner, which rejection was, on appeal by the relator, affirmed by the acting Secretary of the Interior, and afterward by the respondent on review. The undelivered patent was then regularly cancelled, together with the entry upon which it was based.

The answer of the Secretary was accompanied by certain exhibits. The relator filed a replication thereto.

The following agreed statement of facts was signed by counsel for the respective parties: —

"*Agreed Statement of Counsel.*

"In the Supreme Court of the District of Columbia, this fourteenth day of November, 1879.

"THE UNITED STATES, *ex relatione*  
    THOMAS McBRIDE,  
            *vs.*       } At law.   No. 21,200.  
CARL SCHURZ, Secretary of the Department of the Interior.

"Be it remembered that on the hearing of this cause before the Supreme Court of the District of Columbia, sitting in general term, on the twenty-eighth day of October, 1879, it was conceded by both parties that all the allegations of the original petition were true, except the one that the premises named in the petition were in 1862 subject to pre-emption filing or homestead entry.

"It was also conceded that the case relating to said premises, set out in the answer of respondent, had been appealed from the decision of the Commissioner of the General Land-Office to the Secretary of the Interior, and was pending before the said secretary at the time the demand for said patent was made on him, as set forth in the said original petition of relator, and for some days thereafter, and that at the time of said demand, and for some days thereafter, the said patent was, with the papers in said case, as an exhibit in said case, in the office of the Secretary of the Interior, and was not in the office of the Commissioner of the General Land-Office.

"It was also conceded that the incorporated town of Grantsville, set forth in the answer of the respondent, was in fact the incorporated city of Grantsville, and that it was incorporated by the territorial legislature of Utah on the twelfth day of January, 1876, and that said act should be treated as referred to and made a part of this case.

"All other matters in said case stood upon the original and supplemental petition, the answer of respondent, and the replication thereto. There was no other or further proof or evidence offered by either party.

"One of the rules of this court is as follows: —

" 33. The joinder in issue may be —

" ' The plaintiff joins issue upon the defendant's first plea.

" ' The defendant joins issue upon the plaintiff's replication to the first plea.'

" And this form of joinder shall be deemed to be a denial of the substance of the pleading to which it relates, and an issue thereon.

" And thereupon the said court, upon the tenth day of November, 1879, upon the evidence and pleading aforesaid, gave judgment for the said respondent.

" The foregoing facts are stipulated to be a full and true statement of this case, and made part of the record therein.

" Nov. 14, 1879.          " W. H. SMITH,
                                   " Att'y for Plff.
                              " U. J. BAXTER,
                              " Of Counsel for Respondent.

" Whereupon the court orders the said stipulation to be made of record in the case."

Instead of an alternative writ of mandamus, a rule upon the Secretary to show cause was granted by the court. The case was heard upon the pleadings and the above agreed statement, and the rule discharged.

Thereupon the United States on the relation of McBride sued out this writ, and assigns for error that the court below erred in refusing to issue a mandamus in conformity to the prayer of the petition.

Mr. Walter H. Smith and Mr. James H. Mandeville for the relator.

1. The court below had jurisdiction. Kendall v. United States, 12 Pet. 524. The whole question was fully and elaborately argued in that case, and the doctrine announced, that, by reason of the adoption of the laws of Maryland for the government of this part of the District, the Circuit Court, under the act of Feb. 27, 1801, which established it and defined its jurisdiction, could, as incident to its common-law powers, issue the writ to an executive officer of the United States, it at that time having general jurisdiction in cases at common law, and being the highest court of original jurisdiction in the District. That decision has been followed in all the subsequent cases. The Circuit Court has, it is true, been superseded by the court

below; but the latter has the same powers, and the statutory provisions which were regarded as controlling in *Kendall* v. *United States* are still in force, and are as applicable to it as they were to the Circuit Court.

2. We admit that the Secretary of the Interior, in carrying into effect his supervisory and appellate power over the branches of the public service committed to his department is not subject to judicial control in matters involving the exercise of his judgment and discretion. When the demand in question was made there was no longer any scope for the exercise of either. He had but a plain ministerial duty to perform after the title had been transferred to McBride by the due execution and recording of the patent. Being a title by record, the delivery of the patent was not necessary to vest the land in individual proprietorship. *Phillip's Lessee* v. *Irwin*, 1 Tenn. 235; *Green* v. *Liter*, 8 Cranch, 247; *Cunningham* v. *Browning*, 1 Bland, 304; *Steele* v. *Lowry*, 4 Ohio, 72; *Enfield* v. *Pennit*, 8 N. H. 515; *Lapeyre* v. *United States*, 17 Wall. 191; *LeRoy* v. *Clayton*, 2 Sawyer, 496; *LeRoy* v. *Jamison*, 3 id. 391; *Marbury* v. *Madison*, 1 Cranch, 137; *Lavergnes' Heirs* v. *Elkin*, 17 La. 227; *Mitchell* v. *Ryan*, 3 Ohio St. 387; *Donner* v. *Palmer*, 31 Cal. 510; *Chipley* v. *Farris*, 45 id. 539; *Miller* v. *Ellis*, 57 id. 73; *People* v. *Livingston*, 8 Barb. (N. Y.) 255; *Smalley* v. *McLain*, 14 Ga. 254; *Willis* v. *Jermin*, Cro. Eliz. 167; *Ex parte Beck*, 1 Bro. C. C. 578; *Ex parte Koop*, 6 Ves. 599; *Leighton's Case*, 2 Vern. 173; *O'Reilly's Case*, 1 Ves. Jr. 112; *Ex parte Kurtman*, 3 Rich. (S. C.) Ch. 257; 3 Op. Atty.-Gen. 654; Bacon's Abr., tit. Pre. F.; 2 Bl. Com. 344; 3 Wash. Real Prop. 520.

The lands covered by the patent having ceased to be a part of the public domain, the Secretary's jurisdiction to determine any conflicting claim to them absolutely ceased. He might as well have tried an action of ejectment for a parcel of ground in this city, or passed a decree to quiet the title thereto.

3. It has been urged that a patent is sometimes improvidently executed and recorded under a mistake of fact, or from error in law, and that public mischief and individual hardship will ensue if the Secretary has no authority to recall it before its delivery, and cause it to be cancelled and the record of it to be expunged.

To this we answer, *First*, that the destruction of a deed, after it has worked a transfer of title, does not reinvest the estate in the grantor. *Secondly*, that the assumption of a power not conferred by law finds no justification in the fact that a mischief may be thereby suppressed, or a private right maintained, even conceding that the power may in some hands be wisely exercised to secure what is believed to be a lawful end. If in the administration of the land system further powers should be vested in the Secretary of the Interior, Congress alone can confer them. *Thirdly*, that it is the exclusive province of the courts to avoid, in a direct proceeding, a patent which has been granted on a false suggestion, or by mistake. *Bruner* v. *Manlove*, 1 Scam. 161; *Mowry* v. *Whitney*, 14 Wall. 434; *Doll* v. *Meader*, 16 Cal. 295; *Leese* v. *Clark*, 18 id. 572; *People* v. *Stratton*, 25 id. 242; *Brady* v. *Begum*, 26 Barb. (N. Y.) 529; *State* v. *Bachelder*, 5 Minn. 223; *Arnold* v. *Grimes*, 2 Iowa, 85; *Patterson* v. *Winn*, 9 Pet. 663; *Williams* v. *Carpenter*, 33 Mo. 52.

4. In this case the Secretary, by withholding the patent and the exemplification of it, wrongfully deprives the relator of the indispensable evidence of his title, and the latter, having no other adequate remedy, is entitled to a *mandamus*. *Marbury* v. *Madison*, 1 Cranch, 137.

5. The Secretary is the proper party defendant. Rev. Stat., sects. 441, 453.

*The Attorney-General, contra.*

1. The court below has no jurisdiction to issue a *mandamus* to an executive officer of the United States. The statute which in *Kendall* v. *The United States* (12 Pet. 524), and in subsequent cases, was construed as vesting the Circuit Court or the Supreme Court of the District with such jurisdiction has been repealed.

By the Revised Statutes relating to the District of Columbia certain sections are substituted for that statute. They, if differing in language or effect from it, must prevail in all cases thereafter arising. *Bowen* v. *United States*, 100 U. S. 508.

Sect. 61 gave power to the legislative assembly to modify the practice and enlarge the jurisdiction of the courts of the

District whenever necessary to the due execution and enforcement of the laws of the District.

Sect. 89 continued in force the organization of the judicial courts.

Sect. 91 continued in force the local municipal laws.

Sect. 92, which is first in importance in this connection, continued in force the laws of the State of Maryland *not inconsistent with this title,* as the same existed on the 27th of February, 1801, except as since modified or repealed by Congress or by authority thereof, or until so modified or repealed.

Sect. 93 declares that the Constitution and all laws of the United States not locally inapplicable shall have the same force and effect within the District as elsewhere within the United States.

These are the existing provisions. They undoubtedly include the former laws of Maryland which, as local law, are necessary to the proper administration of justice in the District. The Maryland laws governing local matters, individual rights, and personal transactions are preserved for all the ends of municipal and local government. Whatever goes beyond this and relates to officers of the United States as such, whose duties are supposed to be the same whether in or out of the District, trenches upon the domain of Federal law, and must be considered as not local in its character. Such general laws must be applied with the same force and effect in the District of Columbia as elsewhere. Sect. 93. If no local reason exists for enlarging their scope, they have no exclusive application to the District.

The Revised Statutes vest the courts of the District with the *same* jurisdiction as that possessed and exercised by the Circuit and the District Courts of the United States. Sect. 763, as amended by the act of Feb. 27, 1877 (19 Stat. 253), grants the local jurisdiction necessary to the enforcement of the laws previously cited. Such jurisdiction was not included in that conferred upon the courts of the District as circuit and district courts. This jurisdiction is limited by sect. 767–769, with respect to original pleas; subordinate and inferior causes being confided to justices of the peace, under chapter 31 of the Revised Statutes relating to the District of Columbia.

Now, while it is true that the statutes and the common law which prevailed in Maryland in 1801 were, by act of Congress, continued in force in this District, yet *Kendall* v. *United States (supra)* declares that the power of the Circuit Court to exercise the jurisdiction now in question resulted from the analogy which that court, as the highest judicial tribunal within the District, bore to the highest Maryland court, and that its power to issue a *mandamus* to an executive officer was conferred by the third section of the act of Feb. 27, 1801, giving it the same jurisdiction as the circuit courts of the United States then possessed under the act of Feb. 13, 1801. The subsequent repeal of the latter act, it was held, did not change within the District the jurisdiction previously vested. As that third section is repealed, the grant of "the same jurisdiction as the circuit courts of the United States" which is made to the Supreme Court of the District by the act of revision, June 22, 1874, must be measured and determined by the law as it stood at the latter date. *McClung* v. *Silliman* (6 Wheat. 598) and *McIntire* v. *Wood* (7 Cranch, 504) expressly decide that since the repeal of the act of Feb. 13, 1801 (2 Stat. 89), by that of April 29, 1802 (2 Stat. 156), no such jurisdiction as that now claimed is vested in the circuit courts of the United States. It cannot, therefore, be exercised by the court below.

2. It is conceded by the counsel for the relator that such jurisdiction, if it exists, does not extend to the acts of the Secretary which involve the exercise of his judgment and discretion. The issue of a patent for public lands of the United States is such an act, and to render the instrument effectual delivery is essential.

This conclusion may be drawn from the language of the law. Sect. 453, Rev. Stat., requires the Commissioner of the General Land-Office to perform, under the direction of the Secretary of the Interior, "all executive duties" which relate to "the issuing of patents for all grants of land under the authority of the government." Sect. 458 prescribes the requisites as to their form, signature, and record. Sect. 459 provides for a special officer to complete the issue, "in pursuance of instructions from the commissioner," by certifying, affixing the seal, engrossing, recording, and transmitting such patents. These are the pre-

scribed " executive duties " which relate to the issuing of the
patent as previously assigned.   Each statutory proceeding is
essential to the operation of the whole.

In *Mc Garrahan* v. *Mining Company* (96 U. S. 316), it is said
that " the patent executed in the prescribed form which issues
from the General Land-Office is made the instrument of pass-
ing title out of the United States." Here it is obvious that the
execution in the prescribed form is referred to as being quite
distinct from, and independent of, the issue from the General
Land-Office.   Execution is not issue, nor does the patent issue
by the record; for it is immediately said by the court that " the
record called for by the act of Congress is made by copying
the patent to be issued into the book kept for that purpose.
The effect of the record, therefore, is to show that an instru-
ment such as is there copied has actually been prepared for
issue from the General Land-Office."   The issue from the office
must, in pursuance of this doctrine, mean something beyond
and subsequent to the recording, and the next statutory duty
named in sect. 459 is the " transmission " of such patent.
Here is the final executive duty connected with the instrument
itself, and by it delivery to the patentee must be intended.   It
will not do to say that this does not mean delivery, without
suggesting any other possible definition.   The established regu-
lations of the General Land-Office require this duty of the
recorder, and rules are published governing the transmission of
patents to the patentees through the intervention of the District
land-officers as agents of the government, or directly from the
General Land-Office, the possession of the instrument never
being given up except upon surrender of the duplicate receipt,
or proof, by affidavit, of its loss.   For authority to establish
such regulations, see *Snyder* v. *Sickles*, 98 U. S. 203; Rev.
Stat. 2478.

Here, then, is an official executive act necessary to the com-
plete issue of the patent, and essential to its operation to
pass the title of the United States.   The delivery, personally,
by the recorder is said to be a better recognition of its valid-
ity than the record itself.   *Mc Garrahan* v. *Mining Company*,
*supra*.   And again, in speaking of the effect of an imperfect
instrument perfectly recorded, or a perfect instrument imper-

fectly recorded, to prove a grant, the court says, "If a perfect patent has in fact issued, it must be proved in some other way than by the record." p. 323.

The issue, which, it has been shown, is subsequent to the record, and can only mean delivery, is treated as the thing to be proved; all the matters of record are but instruments of evidence to establish the *fact of issue.* And so the court says : "When a right to a patent is complete, and the last formalities of the law in respect to its execution and issue have been complied with by the officers of the government charged with that duty, the record will be treated as presumptive evidence of *its delivery to and acceptance by the grantee.*" And in the final clause it is said that the record will be treated as a perfect record of an imperfect instrument, "until overcome by proof that the instrument as executed and *delivered* was valid." The only reasonable inference from these repeated allusions to the delivery and possession of the patent is that *delivery* is deemed by this court to be essential to the complete issue of the patent and the conveyance of the legal title.

And to the same effect is *Moore* v. *Robbins*, 96 U. S. 530. It is there said : "When the patent has been awarded to one of the contestants, and has been issued, *delivered*, and accepted, all right to control the title, or to decide on the right to the title, has passed from the land-office." p. 532. Again: "If . . . the patent . . . is *delivered to* and accepted by the party. the *title* of the government passes with this *delivery.* With the title passes away all authority or control of the executive department over the land, and over the title which it has conveyed." p. 533. This moment of *delivery* and acceptance is the instant when authority and control over the title cease, and the issue is complete in law. Up to that moment executive authority and discretion continue, and the official functions, with which the courts cannot interfere, remain unimpaired in the officer having original power in the matter. The court says: "The functions of that department necessarily cease when the title has passed from the government. And the title does so pass where, under the decisions of the officers having authority in the matter, a conveyance, generally called a patent, has been signed by the President, and sealed and *delivered* to and accepted by the grantee." p. 533.

This has been declared to be the effect of executive acts, done within the scope of legal authority. Attention was specially directed to the action of the department in land cases. The inquiry of the court, on p. 534, was, "If such a power exists, when does it cease?" The answer, three times asserted, fixes as the precise period of time the *delivery and acceptance of the patent.* The patentee, taking by matter of record the grant of the government, may rely on such record, after the complete issue and delivery of his patent, for proof that it was so delivered and accepted. The record is undoubtedly presumptive evidence of the delivery, as it is also of the validity of the grant; but it does not operate to complete title without such delivery. In 2 Bl. Com. 348, it is said that the king's grant, if he grants an estate contrary to law, or if his own title to the thing granted be different from what he supposes, is absolutely void. Washburn on Real Property (vol. iii. p. 520) says that the parent, "when regularly and properly issued, becomes a complete evidence of title."

It thus appears that delivery is essential to the issue of a patent. Up to that time, its regularity can be determined only by the Interior Department. The courts have not yet acquired jurisdiction. In *Bell* v. *Hearne* (19 How. 252) and *Maguire* v. *Tyler* (1 Black, 195, and 8 Wall. 664), patents had been prepared and delivered. The court held that, as there was no acceptance, the delivery was not good, and the recall and cancellation of them were proper, leaving the status of the land precisely as it had been before the instruments were recorded. In the first case, the patent had reached the true grantee, John Bell, but, by error in the certificate of entry, it had been executed in favor of James Bell, and by assignment the land had passed to other parties as his property. But the court sustained the recall of the surrendered patent against the claim of James Bell, who alleged that he was the grantee *of record,* and it gave as a reason, that the patent had never been delivered to *him.*

These cases cannot be explained except upon the theory that the delivery was essential; that a refusal to accept the patent prevented such delivery, and upon its return to the Commissioner of the General Land-Office he had power to cancel it and

the record thereof, and deal with the lands according to their status before its execution. For, if the record proved title, the latter had passed without delivery, and to restore it a reconveyance would have been required. But the court says that the status of the land was the same after the recall as before the preparation of the patent. Never having been effectually delivered, its possession by the commissioner gave him jurisdiction for good cause to cancel it. *Doswell* v. *De la Lanza,* 20 How. 29; *Phillips* v. *Shaw,* 36 Ala. 189.

McBride can take nothing by the mere execution and recording of his patent *without* delivery. If a mistake in the condition of the title, or a want of authority to issue it, be discovered before completing its issue by delivery, no title or right depending on such execution passed to him, and the department may treat it as void, and proceed to dispose of the land according to law. The cases cited fully sustain this position. Title by matter of record, as shown by the authorities cited by his counsel, differs from feoffment only in not requiring livery of seisin to vest the title. It does not dispense with delivery of the instrument. This is true in most cases of deed by private individuals or municipal bodies in the American States, but the deed takes effect only from delivery. *County of Calhoun* v. *American Emigrant Company,* 93 U. S. 124.

3. Constructive delivery may and does exist where the grantor, in the exercise of his proper authority, places the deed in the hands of a stranger for the use of the grantee, or even in some cases where he retains possession, at the same time sufficiently manifesting his intention to treat it as having passed the title to the grantee. This doctrine cannot, however, prevail in this proceeding. The petition admits and the record shows that the instrument has never passed from the custody of the government, and McBride sues to compel its original delivery. He cannot now assert that there has already been a constructive delivery.

The latter cannot be presumed, for the further reason, that at the date of the demand the fact had become known to the proper officer that he had mistaken the true condition of the title, and was forbidden by law to issue the patent as the act and deed of the government.

The direction to a subordinate official to deliver it was to take effect only upon the express acceptance of McBride, accompanied by his surrender of the outstanding duplicate, or proof of its loss.   This direction might be revoked upon discovery of sufficient reasons to defeat the efficacy of the patent, just as final delivery might have been refused by the commissioner had it remained in his personal custody.   Before its preparation, and afterwards, the authorities of Grantsville claimed the land under the town-site law of 1867.  14 Stat. 541.  There was a contest pending and undetermined before the land-office, between them and McBride, involving their respective rights. The patent was prepared, therefore, by some accident or mistake, in violation of law and the rules of the department.   It necessarily follows that the power to adjudge whether it ought to issue had not been exercised by the Commissioner of the General Land-Office in the first instance, or by the Secretary on appeal.   They were, therefore, not precluded from further examining and deciding the case according to the rules and regulations of the department.   Nor could they deprive either contestant of the right to a full hearing by the delivery of an improvidently prepared patent to the other.

Lands within town-site limits are excluded from the operation of the homestead law.   Hence, in 1869, McBride's entry was illegal, and a patent, if issued to him thereon for the land, would be equally so.   " No title can be held valid which has been acquired against law. . . . The patent of defendant having been for lands reserved for such appropriation is void."   *Stoddard* v. *Chambers*, 2 How. 284; *Ross* v. *Doe ex dem. Barland*, 1 Pet. 655; *Lindsey* v. *Miller's Lessee*, 6 id. 666; *Brown* v. *Clements*, 3 How. 650; 5 Op. Att.-Gen. 9.   *Newhall* v. *Sanger* (93 U. S. 761) holds in effect that the patents to the railroad company, not having been issued in " compliance with the requirements of the acts of Congress, commonly known as the Pacific Railroad Acts," were invalid and passed no title.   So, in *Leavenworth, Lawrence, & Galveston Railroad Co.* v. *United States* (id. 733), the certified lists of selected lands, furnished by the Commissioner of the General Land-Office to the Governor of Kansas, which, by statute (10 Stat. 346), have the force and effect of a patent, were pronounced void, as the lands were not subject to

selection under the grant to that State for railroad purposes. To the same effect are *Reichart* v. *Felps*, 6 Wall. 160.; *Shepley et al.* v. *Cowan et al.*, 91 U. S. 330; *Wirth* v. *Branson*, 98 id. 118.

The case is this: By some inadvertence, a patent, which if delivered would pass no title, was prepared, signed, sealed, and recorded. The fact was discovered before the instrument had passed from the possession of the Interior Department, and before a decision as to McBride's right was made. It was withheld pending the final disposition of the contest involving the title to the land, and the decision has been rendered against him. As its delivery would be illegal, it is respectfully submitted that the Secretary cannot be compelled to do an act which is either unlawful or beyond his rightful jurisdiction and authority.

MR. JUSTICE MILLER, after stating the case, delivered the opinion of the court.

Some question was made, on the argument in this court, as to the effect of the answer as evidence, and the practice in the Court of King's Bench, in England, has been referred to as making the return to the writ conclusive, or at least evidence, of all it states. We are relieved of any difficulty on this point by the stipulation of the parties.

No writ of *mandamus*, alternative or otherwise, was issued. There was, therefore, no technical return, and in strictness the rule applicable to such a writ does not apply. If, however, it could be held that the answer to the rule to show cause stands in the place of a return to a writ of *mandamus*, the parties have voluntarily made their own issues, and stipulated as to the evidence which shall be considered by the court.

By this stipulation the allegations of the original petition, except one which is specified, are to be taken as true. Certain other facts are then set out. It is then added that all other matters stand upon the original and supplemental petitions, the answer, and replication, and that there was no other or further proof offered by either party. As the replication distinctly put in issue every paragraph of the answer, as no evidence was offered in support of the answer, and as the rule of the court is

recited which makes the replication in this case a denial of the substance of the pleading to which it relates, we must exclude the supplemental petition and the answer of the respondent as evidence, and decide the case on the allegations of the original petition and the facts stipulated in the agreed case.

We are met at the threshold of this inquiry by a denial of the authority of the Supreme Court of the District of Columbia to issue a writ of *mandamus*, as an original process.

The argument is, that the jurisdiction of that court over this class of subjects is governed by sect. 760 of the Revised Statutes relating to the District of Columbia. That section enacts that " the Supreme Court shall possess the same power and exercise the same jurisdiction as the circuit courts of the United States." As this court decided in *McIntire* v. *Wood* (7 Cranch, 504) and *McClung* v. *Silliman* (6 Wheat. 598) that the circuit courts of the United States possessed no such power, the argument would be perfect if no other powers on that subject existed in the Supreme Court of the District than what is conferred by the above section.

This court, in *Kendall* v. *United States* (12 Pet. 524), had under consideration the act of Feb. 27, 1801, organizing originally the courts of this District. It was held that the clause of the act declaring the laws of Maryland to be in force at that date in the part of the District ceded by her invested the Circuit Court, as it was then called, with this very power, because it was a common-law jurisdiction, and the common law on that subject was then in force in Maryland. This proposition has been repeatedly upheld by the court since that time, and up to the date of the revision it was no longer an open question that in a proper case the court had authority to issue the writ.

It is now said, however, that this section being enacted as of the first day of December, 1873, defines the jurisdiction of the Supreme Court of the District as governed by the powers of the circuit courts of the United States over the same subject at that date, at which time it is clear these latter courts had no such power; and that, as the revision repealed all other laws on the same subject, the act concerning the law of Maryland no longer applied to the case.

This leaves out of the process of reasoning the ninety-second section of the revision, which declares again that "the laws of the State of Maryland, not inconsistent with this title, as the same existed on the twenty-seventh day of July, 1801, except as since modified or repealed by Congress or by authority thereof, or until so modified or repealed, continue in force within the District." Thus the argument is precisely the same as it was in *Kendall* v. *United States*, for it was urged there, as here, that as the act creating the court measured its jurisdiction by that of the circuit courts of the United States, which had no such jurisdiction, there could be none in the former; to which the court replied, the provision which continued in force the laws of Maryland.

The revision has merely separated the different sections of the act of Feb. 27, 1801, and placed part of it in sect. 760 and part of it in sect. 92. Neither provision is repealed, and we think that both of them are retained, with the construction placed on them by this court in *Kendall* v. *United States* and the subsequent cases. But this question would seem to be set at rest by the act of 1877, "to perfect the revision of the Statutes of the United States, and of the statutes relating to the District of Columbia." The act amends sect. 763 of the Revised Statutes relating to the District of Columbia, by enacting that "said courts shall have cognizance of all crimes and offences committed within said District, and of all cases in law and equity between parties, both or either of which shall be resident or be found within said District, and also of all actions or suits of a civil nature at common law or in equity, in which the United States shall be plaintiffs or complainants." 19 Stat. 253.

We are of opinion that the authority to issue writs of *mandamus* in cases in which the parties are by the common law entitled to them is vested in the Supreme Court of the District of Columbia.

We proceed to inquire whether the relator has made such a case.

If the relator was entitled to the possession of the patent as his property, and it was the plain duty of the Secretary to deliver it to him when demanded; then, under all the author-

ities, and especially the decisions of this court, he is entitled to the remedy he asks. From the case of *Marbury* v. *Madison* (1 Cranch, 137), down to the present time, such has been the settled doctrine of this court. And though it may be said that the opinion of Mr. Chief Justice Marshall in that case was not necessary to the decision made, which was that *this* court had no *original* jurisdiction in that case, the principles of the opinion have since been repeatedly recognized and acted upon in this court, and the case cited with approval in its definition of the circumstances under which persons holding public offices will be compelled to perform certain duties which are merely ministerial. *Kendall* v. *United States*, 12 Pet. 524; *Decatur* v. *Paulding*, 14 id. 497; *Kendall* v. *Stokes et al.*, 3 How. 87; *Commissioner of Patents* v. *Whiteley*, 4 Wall. 522.

The next objection to issuing the writ which we are called to consider is that the Secretary, in deciding whether he would deliver the patent to McBride or not, was called upon to exercise a judgment and discretion on the case presented to him which were not merely ministerial, but which were rather judicial in their character, and in regard to which many matters were to be considered, — such as the validity of the title conferred by the patent, the circumstances under which it was signed, sealed, and recorded, and the conflicting rights of other parties to the lands covered by it. In short, that this execution of the patent concluded nothing, and the authority of the Secretary and the Commissioner of the General Land-Office to deal with the whole subject, including the relator's right to the lands, remained unaffected by the patent. Whether this be so or not must depend upon the authority conferred by Congress upon those officers, and the effect of the patent in the stage which it had reached when the demand for its possession was made by McBride.

The Constitution of the United States declares that Congress shall have power to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States. Under this provision the sale of the public lands was placed by statute under the control of the Secretary of the Interior. To aid him in the performance of this duty, a bureau was created, at the head of which

is the Commissioner of the General Land-Office, with many subordinates. To them, as a special tribunal, Congress confided the execution of the laws which regulate the surveying, the selling, and the general care of these lands.

Congress has also enacted a system of laws by which rights to these lands may be acquired, and the title of the government conveyed to the citizen. This court has with a strong hand upheld the doctrine that so long as the legal title to these lands remained in the United States, and the proceedings for acquiring it were as yet *in fieri*, the courts would not interfere to control the exercise of the power thus vested in that tribunal. To that doctrine we still adhere.

But we have also held that when, by the action of these officers and of the President of the United States, in issuing a patent to a citizen, the title to the lands has passed from the government, the question as to the real ownership of them is open in the proper courts to all the considerations appropriate to the case. And this is so, whether the suit is by the United States to set aside the patent and recover back the title so conveyed, as in *United States* v. *Stone* (2 Wall. 525), or by an individual to cause the title conveyed by the patent to be held in trust for him by the patentee on account of equitable circumstances which entitle the complainant to such relief. *Johnson* v. *Towsley*, 13 id. 72, and other cases.

In the case before us it is said that the instrument called a patent, which purports in the name of the United States to convey to McBride the lands in controversy, is not effectual for that purpose for want of delivery. That though signed, sealed, countersigned, and recorded, and then sent to the register of the land-office at Salt Lake City for delivery to him, it never was so delivered, and has always remained under the control of the officers of the Land Department, and that the instrument is invalid as a deed of conveyance for want of delivery to the grantee. If it were conceded that delivery of the patent is essential to the transfer of title to the grantee, and that such delivery is required as is necessary in a conveyance from man to man, it would be a question of some difficulty to decide whether such delivery took place in this case. The well-known principle by which the intention of the grantor in

a deed to make an act which falls far short of manual delivery, to stand for delivery, when so designed, might well be applied to the act of the commissioner in transmitting the patent by mail to the local office for the purpose of delivery; while, on the other hand, it is argued with much force that the instrument never actually passed from the land-office or the control of its officers. We do not think the decision of this point necessary to the case before us.

We are of opinion that when, upon the decision of the proper office that the citizen has become entitled to a patent for a portion of the public lands, such a patent made out in that office is signed by the President, sealed with the seal of the General Land-Office, countersigned by the recorder of the land-office, and duly recorded in the record-book kept for that purpose, it becomes a solemn public act of the government of the United States, and needs no further delivery or other authentication to make it perfect and valid. In such case the title to the land conveyed passes by matter of record to the grantee, and the delivery which is required when a deed is made by a private individual is not necessary to give effect to the granting clause of the instrument.

The authorities on this subject are numerous and uniform. They have their origin in the decisions of the English courts upon the grants of the crown evidenced by instruments called there, as here, patents.

Blackstone describes four modes of alienation or transfer of title to real estate, which he calls common assurance: the first of which is by matter *in pais* or deed; the second by matter of record, or an assurance transacted only in the king's public courts of record; the third by special custom; and the fourth by devise in a last will or testament.

In the chapter devoted to alienation by deed he enumerates among the requisites to its validity the act of delivery. Book 2, c. 20. But in chapter 21, devoted to alienation by matter of record, nothing is said about delivery as necessary to pass the title, and under this head he includes the king's grants. These, he says, are all made matter of public record, and are contained in charters or letters-patent. He then recites the processes by which patents are prepared and perfected, the

various officers through whose hands they pass, and the manner of affixing the seal to them, and their final enrolment. They are then perfect grants, and no mention is made of delivery as a prerequisite to their validity. After this they can only be revoked or annulled by *scire facias* or other judicial proceeding. The importance attached to the delivery of the deed in modern conveyancing arises largely from the fact that the deed has taken the place of the ancient livery of seisin in feudal times, when, in order to give effect to the enfeoffment of the new tenant, the act of delivering possession in a public and notorious manner was the essential evidence of the investiture of the title to the land. This became gradually diminished in importance until the manual delivery of a piece of the turf, and many other symbolical acts, became sufficient. When all this passed away, and the creation and transfer of estates in land by a written instrument, called the act or deed of the party, became the usual mode, the instrument was at first delivered on the land in lieu of livery of seisin. Shepherd's Touchstone, 54; Co. Litt. 266 *b*; Washburn, Real Property, book 3, 308. Finally, any delivery of the deed, or any act which the party intended to stand for such delivery, became effectual to pass the title. *Church* v. *Gilman*, 15 Wend. (N. Y.) 656; *Butler* v. *Baker*, 3 Co. 25 *b*; *Warren* v. *Swelt*, 31 N. H. 332; *Hatch* v. *Hatch*, 9 Mass. 307.

But in regard to the transfer of title by matter of record, whether this record were a judgment or decree in a court of justice, as fines and recoveries, or the record made in the proper office (generally in the Court of Chancery by the Lord Chancellor) of the king's grant, called enrolment, no livery of seisin was necessary, nor any delivery of the document sealed with the king's seal; for when this seal was affixed to the instrument and the enrolment of it was made, no higher evidence could be had, nor was any other evidence necessary of this act or deed of the king. Hence, Mr. Cruise, in his Digest of the English Law of Real Property, says: "The king's letters-patent need no delivery; nor his patents under the great seal of the Duchy of Lancaster; for they are sufficiently authenticated and completed by the annexing of the respective seals to them." Title xxxiv. sect. 1, par. 3.

In *Marbury* v. *Madison*, to which we have already referred, the court, likening the commission of the justice of the peace, which was signed and sealed by the President and left in the hands of the Secretary of State, to a patent for lands, uses this language : " By the act passed in 1796, authorizing the sale of lands above the mouth of the Kentucky River (vol. iii. p. 229), the purchaser, on paying his purchase-money, becomes completely entitled to the property purchased, and on producing to the Secretary of State the receipt of the Treasurer, upon a certificate required by the law, the President of the United States is authorized to grant him a patent. It is further enacted that all patents shall be countersigned by the Secretary of State and recorded in his office. If the Secretary of State *should choose to withhold this patent*, or the patent being lost should refuse a copy of it, can it be imagined that the law furnishes to the injured party no remedy? *It is not believed that any person whatever would attempt to maintain such a proposition.*"

In another part of the opinion it is said : "In all cases of letters-patent, certain solemnities are required by law, which solemnities are the evidences of the validity of the instrument. A formal delivery to the person is not among them. In cases of commissions, the sign-manual of the President and the seal of the United States are those solemnities."

The same principle is found in the opinion of the court, delivered by Mr. Justice Story, in *Green* v. *Liter*, 8 Cranch, 229.

Many decisions of State courts of the highest character to the same effect are cited in the brief of counsel for the relator in this case, among which may be mentioned *Ex parte Kuhtman*, 3 Rich. (S. C.) Ch. 257 ; *Donner* v. *Palmer*, 31 Cal. 500. The subject is very fully and ably discussed by Mr. Justice Field in the case of *Leroy* v. *Jamison*, 3 Sawyer, 369.

It is also said that there was no acceptance of this patent by the grantee, and for that reason it is ineffectual to convey title. It is not necessary to enter into much discussion on this subject, because the acceptance of a deed may be presumed under circumstances far short of what was admitted to exist in this case.

The doctrine on this point is well stated by Attorney-General

Crittenden, in the case of Pierre Mutelle, in 1841, as found in 3 Op. Att.-Gen. 654, which was a case like the present, in regard to the duty of the Secretary to deliver the patent then lying in the office.

. "My opinion," said he, " is that the title to the land *did pass to Pierre Mutelle at the date of .the patent to him, though that patent still remains in the land-office without any actual tradition of it to .any one.* The patent was issued by authority and direction of law, and upon general principles, *where the patentee does not expressly dissent,* his assent and acceptance are to be presumed from the beneficial nature of the grant. But it is hardly necessary to resort to such presumptions, because, in this and in all such cases, the acts required to be done by the claimant, and actually done by him in the preparation of his claim for patenting, are equivalent to a positive demand of the patent and amount to an acceptance of it. The patent, in the meaning of the act referred to, *is granted to the patentee from its date, though he may never actually see or receive it,* and is valid and effectual to pass the title to the land.

" All legal muniments of title belong to him who owns the land, . . . but as the patent is a recorded evidence of title, always accessible, no material prejudice can result to the true owner from a stranger getting possession of it."

The long pursuit of this claim by McBride, his repeated demand for the patent after it had been perfected, and his persistent effort to obtain possession of it, are ample proof of his acceptance of the grant of which it is the evidence.

It is argued with much plausibility that the relator was not entitled to the land by the laws of the United States, because it was not subject to homestead entry, and that the patent is, therefore, void, and the law will not require the Secretary to do a vain thing by delivering it, which may at the same time embarrass the rights of others in regard to the same land.

We are not prepared to say that if the patent is absolutely void, so that no right could possibly accrue to the plaintiff under it, the suggestion would not be a sound one.

But the distinction between a void and a voidable instrument, though sometimes a very nice one, is still a well-recognized dis-

tinction on which valuable rights often depend. And the case
before us is one to which we think it is clearly applicable. To
the officers of the Land Department, among whom we include
the Secretary of the Interior, is confided, as we have already
said, the administration of the laws concerning the sale of the
public domain. The land in the present case had been sur-
veyed, and, under their control, the land in that District gen-
erally had been opened to pre-emption, homestead entry, and
sale. The question whether any particular tract, belonging to
the government, was open to sale, pre-emption, or homestead
right, is in every instance a question of law as app'ied to the
facts for the determination of those officers. Their decision
of such question and of conflicting claims to the same land by
different parties is judicial in its character.

It is clear that the right and the duty of deciding all such
questions belong to those officers, and the statutes have pro-
vided for original and appellate hearings in that department
before the successive officers of higher grade up to the Secre-
tary. They have, therefore, jurisdiction of such cases, and
provision is made for the correction of errors in the exercise
of that jurisdiction. When their decision of such a question
is finally made and recorded in the shape of the patent, how
can it be said that the instrument is absolutely void for such
errors as these ? If a patent should issue for land in the
State of Massachusetts, where the government never had any,
it would be absolutely void. If it should issue for land once
owned by the government, but long before sold and conveyed,
by patent to another who held possession, it might be held
void in a court of law on the production of the senior patent.
But such is not the case before us. Here the question is ·
whether this land had been withdrawn from the control of the
Land Department by certain acts of other persons, which in-
clude it within the limits of an incorporated town. The whole
question is one of disputed law and disputed facts. It was a
question for the land-officers to consider and decide before
they determined to issue McBride's patent. It was within
their jurisdiction to do so. If they decided erroneously, the
patent may be voidable, but not absolutely void.

The mode of avoiding it, if voidable, is not by arbitrarily

withholding it, but by judicial proceedings to set it aside, or correct it if only partly wrong. It was within the province of those officers to sell the land, and to decide to whom and for what price it should be sold; and when, in accordance with their decision, it was sold, the money paid for it, and the grant carried into effect by a duly executed patent, that instrument carried with it the title of the United States to the land.

From the very nature of the functions performed by these officers, and from the fact that a transfer of the title from the United States to another owner follows their favorable action, it must result that at some stage or other of the proceedings their authority in the matter ceases.

It is equally clear that this period is, at the latest, precisely when the last act in the series essential to the transfer of title has been performed. Whenever this takes place, the land has ceased to be the land of the government; or, to speak in technical language, the legal title has passed from the government, and the power of these officers to deal with it has also passed away. The fact that the evidence of this transfer of title remains in the possession of the land-officers cannot restore the title to the United States or defeat that of the grantee, any more than the burning up of a man's title-deeds destroys his title.

What is this final act which closes the transaction?

In *Marbury* v. *Madison* (*supra*), this court was of opinion that when the commission of an officer was signed by the President and the seal of the United States affixed to it, the commission was complete, and the officer entitled to its possession could enforce its delivery by the writ of *mandamus*. In regard to patents for land, it may be somewhat different, and it is not necessary in this case to go quite so far.

But we may well consider that in all nations, as far as we know, where grants of the property of the government or of the crown are made by written instruments, provision is made for a record of these instruments in some public government office. Our experience in regard to Mexican, Spanish, and French grants of parts of the public domain purchased by us from those governments teaches us that such is the uniform law

of those countries.  We have already shown that under the English law all letters-patent are enrolled, and that this is the last act in the process of issuing a patent which is essential to its validity.

We are safe in saying that every State of the Union has similar provisions in reference to its grants of land, and it has been the effort of most of them to compel public record of all conveyances of land by individuals or corporations.

The acts of Congress provide for the record of all patents for land in an office, and in books kept for that purpose.  An officer, called the Recorder, is appointed to make and to keep these records.  He is required to record every patent before it is issued, and to countersign the instrument to be delivered to the grantee.  This, then, is the final record of the transaction, — the legally prescribed act which completes what Blackstone calls " title by record ; " and when this is done, the grantee is invested with that title.

We do not say that there may not be rare cases where all this has been done, and yet the officer in possession of the patent be not compellable to deliver it to the grantee.  If, for instance, the secretary whom the President is authorized by law to appoint to sign his name to the patent should do so when he has been forbidden by the President, or if, by some mere clerical mistake, the intention of the officer performing an essential part in the execution of the patent has been frustrated.  It is not necessary to decide on all the hypothetical cases that could be imagined.

But we are of opinion that when all that we have mentioned has been consciously and purposely done by each officer engaged in it, and where these officers have been acting in a matter within the scope of their duties, the egal title to the land passes to the grantee, and with it the right to the possession of the patent.

No further authority to consider the patentee's case remains in the land-office.  No right to consider whether he ought in equity, or on new information, to have the title or receive the patent.  There remains the duty, simply ministerial, to deliver the patent to the owner, — a duty which, within all the definitions, can be enforced by the writ of *mandamus.*

It is not always that the ill consequences of a principle should control a court in deciding what the established law on a particular subject is, and in the delicate matter of controlling the action of a high officer of the executive branch of the government, it would certainly not alone be sufficient to justify judicial interposition. But it may tend to reconcile us to such action as we feel forced to take, under settled doctrines of the courts, to see that any other course would lead to irremediable injustice.

If the relator in this case cannot obtain his patent, he is wholly without remedy. He cannot sue the United States, in whom is the title in the absence of the patent; for the United States can be sued in no other court than the Court of Claims, and we have decided that that court has no jurisdiction in such a case. *Bonner* v. *United States*, 9 Wall. 156. There is no one else to sue, for the title is either in the relator or the United States. It may be many years before the city of Grantsville, the party now claiming against him, will get a patent, and it may never do so.

The relator is, therefore, utterly without remedy, if the land be rightfully his, until he can obtain possession of this evidence of his title.

On the other hand, when he obtains this possession, if there be any equitable reason why, as against the government, he should not have it, — if it has been issued without authority of law, or by mistake of facts, or by fraud of the grantee, — the United States can, by a bill in chancery, have a decree annulling the patent, or possibly a writ of *scire facias.* If another party (as the city of Grantsville) is, for any of the reasons cognizable in a court of equity, entitled, as against the relator, to have the title which the patent conveys to him, a court of chancery can give similar relief to the city as soon as the patent comes into his possession, or perhaps before. So that it is plain that by non-action of the Land Department the legal rights of the parties may remain indefinitely undecided, and those of the relator seriously embarrassed or totally defeated, while the delivery of the patent, under the writ of *mandamus*, opens to all the parties the portals of the courts where their rights can be judicially determined.

We are of opinion that the relator in the case, as presented to us, is entitled to the possession of the patent which he demanded, and that the writ of *mandamus* by the Supreme Court of the District of Columbia is the appropriate remedy to enforce that right. The judgment of that court will be reversed, and the case remanded with instructions to issue the writ; and it is

*So ordered.*

Mr. Chief Justice Waite, with whom concurred Mr. Justice Swayne, dissenting.

I am unable to agree to this judgment. There are very few, if any, of the general principles of law so well stated in the opinion of the court, to which I do not give my assent. My objection is to the application which is made of them to the facts of this case.

In the stipulation of the parties, it is "conceded that *the case* relating to said premises, set out in the answer of the respondent, had been appealed from the decision of the Commissioner of the General Land-Office to the Secretary of the Interior, and was pending before the said Secretary at the time the demand for the patent was made on him, as set forth in the original petition of relator, and for some days thereafter, and that at the time of such demand, and for some days thereafter, the said patent was, with the papers in said case, as an exhibit in said case, in the office of the Secretary of the Interior, and was not in the General Land-Office." This is, as I think, an admission that the case set out in the answer was pending, and permits us to look into the answer and ascertain what that case was. The facts on which the case rests may not be admitted, but the existence of the case as set out is.

Looking, then, to the answer, we find that case to have been as follows: On the 24th of February, 1877, the corporate authorities of the city of Grantsville made an application for the cancellation of the entry of McBride on the lands in controversy. This application was forwarded to the Commissioner of the General Land-Office for final adjudication and decision under the law and the established rules and practice of the department, and it came to a final decision by the Commissioner of the General Land-Office Feb. 7, 1879. On the 8th

of April, 1879, McBride appealed to the Secretary of the Interior. In his appeal he claimed, 1st, that the decision of the commissioner was contrary to the preponderance of the evidence as shown in the record of the case, and, 2d, that the decision is contrary to the law of the case.

In the original petition for this *mandamus* it is stated that the patent was dated Sept. 26, 1877. It thus appears distinctly that when the patent was signed, sealed, and recorded there was a contest authorized by law pending in the department between McBride and the corporate authorities of Grantsville as to who had the better right, under the laws of Congress, to the land. It is not pretended that any formal decision was made by any of the department officers charged with that duty that the patent should issue. Under these circumstances it may fairly be inferred, irrespective of the positive averments to that effect in the answer, that the patent was improvidently issued through the neglect of some of the clerks having charge of the business details of the office. In my opinion, it was the imperative duty of the Commissioner of the Land-Office, when these facts were brought to his attention, to direct that the delivery of the patent be withheld.

I agree that, when the right to a patent has become complete, the execution and delivery of the patent itself are the mere ministerial acts of the officers charged with that duty; and I further agree that when the right to a patent has been determined, and the patent has actually been signed, sealed, countersigned, and recorded, no actual delivery is necessary to pass the title. When the last formalities of the law prescribed for the due execution of a patent have been complied with, the grant is complete, if it has before that time been determined in some appropriate way that the right to the patent exists. Ordinarily, the due execution of the patent will be evidence of such a determination. But certainly, as between the United States and the patentee, such evidence will not be conclusive. Different questions may arise if the rights of third persons intervene; but, as between the original parties, until the patent *ought* to issue, it may, in my opinion, be recalled at any time before it gets out of the actual possession of the United States. In reality, it can convey only what the officers of the United

States have the lawful right to grant; and, if it can convey nothing, the Secretary of the Interior ought not to be required by *mandamus* to do a vain thing.

The contest here was as to the right of McBride to his homestead entry. Confessedly, the land is within the incorporated city of Grantsville, and his entry was not made at the land-office until after the town was incorporated, although he settled on the land long before. It was a question, therefore, whether, under the circumstances, he had the right to his entry. That question was pending before the department in the ordinary course of proceedings when the patent was executed. It involved the investigation of facts. This is apparent, both from the case, as set forth in the petition, and the appeal papers which McBride himself filed. That the facts were disputed, too, is apparent from the statement in the appeal that the decision of the commissioner was contrary to the *preponderance* of the evidence. The patent ought not to have been executed if the entry was unlawful. Whether it was lawful or not was, at the time, the question at issue between McBride and the authorities of Grantsville in the contest then pending in the department. The law makes provision for such contests; and we have over and over again held that, in the absence of fraud, the decision of the officers on the facts is final. *Johnson* v. *Towsley*, 13 Wall. 72. As the right of McBride to a patent depended on the result of that contest, will the execution of the patent have the effect of a judgment on the facts before the hearing is concluded?

I will not pursue the subject further. Enough has already been said to show the grounds of my dissent. In my opinion, to direct the Secretary to deliver the patent is to give McBride execution in his pending suit before judgment rendered, and may lead to inextricable confusion.

NOTE. — A motion was subsequently made to modify the order that each party should pay his own costs, and to render judgment against the defendant for costs.

MR. JUSTICE MILLER delivered the opinion of the court.

Our first impression was that as the defendant was sued in regard to the manner in which he had discharged certain official duties as Secretary of the Interior, in which no intentional wrong was charged or proven against him, it

would be unjust to make him pay the costs of the proceeding out of his own pocket.

But a careful examination of the authorities leaves us no option but to follow the rule that the prevailing party shall recover of the unsuccessful one the legal costs which he has expended in obtaining his rights.

In *Kendall* v. *United States* (12 Pet. 524), the leading case establishing the right of a citizen to the use of the writ of *mandamus* to compel a public officer to perform a duty merely ministerial, the relator recovered his costs. The duty in that, as in the present case, was one enjoined upon a cabinet officer, which he refused to perform. It is obvious that he thought he was right in refusing to do the act demanded of him, yet this court, as shown by the report of the case, rendered judgment for costs against him.

In *United States* v. *Boutwell* (17 Wall. 604), which was the case of a writ of *mandamus* against the defendant as Secretary of the Treasury, and which the court held to be abated by his retirement from office, it was said: "It is the personal default of the defendant that warrants the impetration of the writ, and if a peremptory writ of *mandamus* be awarded, the costs must fall upon the defendant." And it is argued that as it would be unjust to make the successor in office of the delinquent secretary pay the cost of defending the action of his predecessor, the writ must of necessity abate.

We cannot, in the face of these cases, refuse the order for costs, however much we might wish it were otherwise. There may be a contingent or other fund of the department out of which they can be paid. If there is none, Congress may provide for it or enact generally that when the officers of the government are sued with reference to the manner in which they have performed or failed to perform their official duties, they, as in revenue seizures and similar cases, shall be relieved from the expense of the suit if they have acted with good motives and upon reasonable grounds.

The relator must have judgment for his costs.