# THE UNITED STATES, ex rel. WEST,

## *v.*

# HITCHCOCK.

---

### MANDAMUS; PRACTICE.

1. The writ of *mandamus* will be issued to the head of a department of the Federal Government or the chief of a bureau upon whom some special duty has been devolved by law, to compel the performance of a ministerial duty by such officer, but will be refused when the duty required of him involves the exercise of judicial or quasi-judicial discretion.

2. Where by a demurrer to a petition for the writ of *mandamus* to require the Secretary of the Interior to approve the selection by the relator of a certain tract of public land under the act of Congress of March 2, 1895 (28 Stat. 876), it is conceded by the Secretary that the relator has done everything required by the statute to be done by him; that he is a proper person to receive the allotment he seeks; that his selection of land is right and proper, and that such selection infringes no other right, the only ground of objection being that as the act of Congress provides that the selections made under it shall be approved by the Secretary, the case is one involving the exercise of judgment and discretion on his part, the demurrer will be overruled, the duty of the Secretary to approve the selection of the relator being a mere ministerial duty, under the circumstances.

3. It is improper practice to make return to a writ of *mandamus*, or to a rule to show cause why the writ should not issue, by a demurrer to the petition upon which the writ or rule to show cause has been issued, the statute of 9th Anne, chap. 20, regulating the proceedings in *mandamus* (the substance of which is embodied in the Code for this District, Secs. 1273–1282) contemplating a return or answer to the writ containing all of the facts upon which the respondent relies, and not a demurrer to the petition.

No. 1130.   Submitted January 9, 1902.   Decided March 4, 1902.

HEARING on an appeal by the relator from an order of the Supreme Court of the District of Columbia sustaining a

demurrer to and dismissing a petition for a writ of *mandamus* to the Secretary of the Treasury.          *Reversed.*

The COURT in its opinion stated the case as follows:

This is an appeal from an order of the Supreme Court of the District of Columbia denying a writ of *mandamus* to require the Secretary of the Interior to approve the selection by the relator Willis C. West of a certain tract of land in the Wichita Reservation in the Territory of Oklahoma under an act of Congress of March 2, 1895. The case was heard in the court below on a demurrer interposed by the appellee, the Secretary of the Interior, to the petition of the relator. The demurrer being sustained, the rule to show cause was discharged and the petition was dismissed; wherefore the relator has appealed. The conceded facts of the case, therefore, are those stated in the relator's petition; and they are the following:

The relator is a white citizen of the United States, over the age of twenty-one years, and resident on the Wichita Reservation, in the Territory of Oklahoma. Long before the year 1891 he married a woman who was by blood a member of the tribe of Wichita Indians, then located on lands belonging to themselves and their affiliated bands in the Indian Territory, but now comprised within the Territory of Oklahoma. By reason of his marriage to this woman he was, in accordance with the usages and laws of the said Wichita Indians, by that act adopted into and thereby became a member of said tribe and has been since the date of such marriage treated and recognized in all respects as a member thereof both by the said Indians themselves and by the authorities of the United States having the management and control of Indian affairs.

On June 4, 1891, an agreement was made between the said Wichita tribe of Indians and its affiliated bands, on the one part, and the United States, on the other, whereby it was provided that there should be selected by and allotted to each member of said tribe and its affiliated bands, native and

adopted, a tract of 160 acres of land, which allotments were not to exceed 1,060 in number. At the time of the negotiation of this agreement, the tribe in council assembled, in confirmation of the relator's previous adoption, solemnly and formally adopted him and recognized him as a member of the tribe, in the presence of the Commissioners for the United States, who negotiated the agreement; and thereupon he then and there participated in the negotiations, and for and on behalf of the tribe and as a member thereof, he, with other members, signed the agreement. Thereafter he received from the United States his share of the tribal funds as other members of the tribe; and he appeared in the year 1895 as a member of the tribe on the census-roll of the tribe made by the Indian Agent under the direction of the Secretary of the Interior. Subsequently, again, on May 21, 1901, with a view to the present assertion of his right, the relator was formally confirmed and recognized as a member of the tribe by a general council of the whole tribe.

By reason of such adoption and of his continued recognition as a member of the tribe, the relator claims to be entitled to all the rights and privileges of the native members thereof, and especially to those arising under the agreement which has been mentioned.

This agreement, which was ratified by an act of Congress of March 2, 1895 (28 Stat. 876–910), and thereby obtained the force of law, provided that each member of the tribe, whether native or adopted, should receive his allotment of 160 acres of land in severalty; that each person over the age of 21 years should have the right personally to select his tract, one-half of which was to be arable and one-half grazing land; that certain portions of the land should be set apart for public purposes, within which no selection should be made, except by those who had previously improved lands therein; and that each and every member of the tribe should have " the undisputed right " to select for his allotment the tract on which he had made improvements, wherever it was situated. The agreement further provided that, when the allotments should " have been selected and taken, as afore-

said, and approved by the Secretary of the Interior," the titles thereto should be held in trust for the allottees respectively by the United States for the term of twenty-five years, after which the lands should be conveyed in fee-simple to the allottees, or their heirs, free from all incumbrances. The remainder of the reservation should be open for settlement under the homestead laws of the United States.

The restriction of the allotments to the number of 1,060 was on account of the fact that the members of the tribe, including both natives and those adopted, amounted to 1,060. At the time of the filing of the relator's petition, August 5, 1901, this number had been diminished by death, and was less than 1,060.

In accordance with the provisions of the agreement and of the act of Congress which ratified the same, the relator selected for his allotment a tract of land containing 160 acres, upon which he had already been in possession and had made improvements, and which was not within the portion of the land reserved for public purposes, and otherwise complied in every respect with the provisions of the agreement and the requirements of the act of Congress. He then applied to the Secretary of the Interior for an approval of his allotment; but the Secretary refused to give his approval. For this refusal no reason appears anywhere in the record. It is alleged in the petition to have been wrongful and in violation of law.

It may be added that all the lands not allotted were thrown open to settlement, under proclamation of the President of the United States pursuant to the act of Congress, on August 6, 1901, the day after the filing of the petition in this cause. And it is understood that some ten or eleven other cases have been similarly held up, dependent upon the determination of the cause now before us.

As already stated, the writ of *mandamus* was refused in the court below; and the relator brings the cause here by appeal.

*Mr. William H. Robeson, Mr. William C. Shelley, Mr. Walter S. Field* and *Mr. Clayton E. Emig* for the appellant.

*Mr. Ashley M. Gould,* United States Attorney for the District of Columbia (*Mr. Willis Van Devanter,* Assistant Attorney-General, and *Mr. William C. Pollock* being with him on the brief) for the appellee:

1. To justify the issuance of the writ of *mandamus* it must be shown that there is a clear legal right in the petitioner to have the act sought to be enforced done by the respondent in the manner proposed, and that it is the duty and within the power of the respondent to perform it. It will not issue in a doubtful case, or where, if issued, it would prove unavailing, or where the party seeking it has another adequate remedy. In all matters requiring the exercise of official judgment, or resting in the sound discretion of the person to whom a duty is confided by law, *mandamus* will not lie, either to control the exercise of that discretion, or to determine upon the decision which shall be finally given. And whenever public officers are vested with powers of a discretionary nature as to the performance of any official duty, or in reaching a given result of official action they are required to exercise any degree of judgment, while it is proper by *mandamus* to set them in motion and to require their action upon all matters officially intrusted to their judgment and discretion, the courts will in no manner interfere with the exercise of their discretion, nor attempt by *mandamus* to control or dictate the judgment to be given. Indeed, so jealous are the courts of encroaching in any manner upon the discretionary powers of public officers, that if any reasonable doubt exists as to the question of discretion or want of discretion, they will hesitate to interfere, preferring rather to extend the benefit of the doubt in favor of the officer. High on Extraordinary Remedies (3d ed.) Sec. 42. See also *Seymour v. South Carolina,* 2 App. D. C. 240; *Lochren v. Long,* 6 App. D. C. 486; *Messenger Co. v. Wight,* 15 App. D. C. 463.

2. This principle that the courts have no power to control the executive officers of the Government in the performance of duties which involve the exercise of discretion or judg-

ment has been recognized and applied by the Supreme Court of the United States in many cases where the right to this extraordinary remedy has been denied, among which may be mentioned: *Marbury* v. *Madison,* 1 Cranch, 137, 170–171; *Decatur* v. *Paulding,* 14 Peters, 497, 515, 516; *Brashear* v. *Mason,* 6 How. 92, 101, 102; *Reeside* v. *Walker,* 11 How. 271, 289; *United States* v. *Seaman,* 17 How. 225, 230; *United States* v. *Guthrie,* 17 How. 284, 303; *Commissioner of Patents* v. *Whiteley,* 4 Wall. 522, 533–534; *United States* v. *The Commissioner,* 5 Wall. 563, 565; *Gaines* v. *Thompson,* 7 Wall. 347, 348–353; *The Secretary* v. *McGarrahan,* 9 Wall. 298, 312; *Dunlap* v. *Black,* 128 U. S. 40, 48; *Miller* v. *Raum,* 135 U. S. 200, 204; *United States* v. *Lynch,* 137 U. S. 280, 286; *Redfield* v. *Windom,* 137 U. S. 636, 643–644; *Boynton* v. *Blaine,* 139 U. S. 306, 319; *Noble* v. *Union River Logging RR. Co.,* 147 U. S. 165, 171; *Brown* v. *Hitchcock,* 173 U. S. 473, 476–477.

3. In the few cases where the writ has been granted the rule is recognized, and in every instance it is carefully pointed out that the action sought to be enforced was purely ministerial, involving no exercise of discretion or judgment on the part of the officer. Those cases are *Kendall* v. *United States,* 12 Pet. 524, 610; *United States* v. *Schurz,* 102 U. S. 378, 395; *Butterworth* v. *Hoe,* 112 U. S. 50, 68, and *Roberts* v. *United States,* 176 U. S. 222, 229, 230.

This unbroken line of decisions leaves no room for doubt as to the principles governing in cases where it is sought to control, through the courts, the executive officers of the Government in the performance of duties imposed upon them. If the acts sought to be enforced are merely ministerial in nature, the writ will usually, though not always even in such cases, be granted; but if they involve in any degree whatever the exercise of discretion or judgment, the writ will not be granted.

4. It is necessary to determine from the facts presented here whether, under the well-established rules and principles, the act sought to be enforced is merely ministerial or is one involving the exercise of judgment and discretion.

Whether the petitioner was married to a Wichita Indian woman, as alleged, is to be determined only after the consideration of evidence, and whether such marriage, if established, operated as an adoption, is to be determined after an investigation of the laws, usages, and customs of that tribe. It would be necessary also to ascertain whether the laws of the United States or the rules and regulations of the Interior Department forbid such marriages or provide that persons may not thus be incorporated into an Indian tribe, and so far as his right is based upon an adoption by formal action of the tribal authorities the usages and customs of the tribe in respect of such matters and any authorized regulations thereof by the Interior Department must be ascertained, and whether the usages and customs of the tribe and the departmental regulation were complied with or observed. This first step in the proceeding to determine whether this petitioner is entitled to an allotment under said agreement, as a member, native or adopted, of said tribe, involves extended investigation and the exercise of discretion and judgment, and is not merely a ministerial act, nor one which the courts will attempt to control.

Had the Secretary of the Interior reached the conclusion that this petitioner was in fact an adopted member of said tribe and entitled to an allotment, there would have been necessity for further investigation to determine whether the land claimed by him was subject to allotment and whether this claimant was entitled to it under the provisions of the agreement. Said agreement provides for the classification of the tract of country out of which said allotments were to be made into grazing and grain-growing land, requires that each Indian shall take at least one-half the area of his allotment in grazing land, prohibits the selection of any land used or occupied " for military, agency, school, school-farm, religious, town-site, or other public purposes," and provides that where any Indian had made improvements upon and was occupying a tract he should have the undisputed right to make his selection so as to include his improvements, without reference to the classification of such lands. The ascertain-

merit of the facts in respect of any particular tract of land to determine whether it is subject to a selection for allotment requires an investigation involving the consideration of proofs and the examination of the records of this and possibly other departments. These are not mere ministerial acts.

It is alleged that the petitioner regularly, duly, and formally applied for an allotment, but it is not stated that he submitted therewith proof of his alleged marriage or adoption otherwise or as to the status and condition of the tract of land applied for. Neither does he allege that one-half of said tract had been classed as grazing land or that he submitted proof that he had improvements thereon which entitled him to take it without regard to the requirement as to classification. If the court below had held it had jurisdiction in the premises no final judgment would have been rendered until these essential matters were satisfactorily established. It is respectfully submitted that the performance of the duties devolving upon the Secretary of the Interior in making and approving the allotments provided for in said agreement involves the exercise of judgment and discretion, and that therefore the acts to be done by him in connection therewith are not such as may be enforced by the writ of *mandamus.* The language of this court in *Seymour* v. *South Carolina, supra,* describes this case as if employed with express reference to it. Here " the executive department is charged with perfectly independent duties, * * * which require the ascertainment of facts, involve the interpretation of laws, and in many respects call for the exercise of judgment and discretion." Applying the principle asserted there, it follows that even if an error has been committed, if the action taken was ill-advised, the courts are powerless to interfere because no appeal is given them, and even though in this instance private interests may suffer and a right be denied, yet these facts do not authorize the interference of the courts.

The agreement provides that when the allotments have been *approved* by the Secretary of the Interior the titles to the lands shall be held in trust for the allottees for the period of twenty-five years and then conveyed to them or their heirs

absolutely. The approval of the Secretary is required to perfect any allotment. The power of approval necessarily implies the power of disapproval, and the decision as to the proper action in any given case involves the exercise of discretion. In *International Contracting Co.* v. *Lamont,* 2 App. D. C. 532, this court had under consideration a law which vested in the Secretary of War the power and duty of approving certain contracts, and the language used in the decision of that case is peculiarly pertinent to this case because of the similarity of the provisions of law involved. See also *Wedderburn* v. *Bliss,* 12 App. D. C. 485, 496, 501; *Runkle* v. *United States,* 122 U. S. 543, 557; *Wisconsin Central R.R. Co.* v. *Price County,* 133 U. S. 496; *Williams* v. *United States,* 138 U. S. 514.

The inquiries and investigations required of and the powers and duties devolved upon the Secretary of the Interior in connection with the approval of allotments under the agreement and act of Congress here under consideration are similar in all respects to those arising in connection with the acts of Congress under consideration in the last two cases cited. If it was proper to say that his actions under those laws were not ministerial, but were judicial in character, the same conclusion must be reached here.

The rule established by the cases cited is that the duty of approval necessarily implies the power of disapproval, and necessitates examination, investigation, the weighing of evidence, and the exercise of judgment and discretion. It involves more than a mere mechanical performance of definite and specific directions of law. It is a judicial or quasi-judicial function, over which the courts have no power of control. The decision appealed from so held and should be sustained.

The grounds or reasons upon which the Secretary based his refusal to approve the allotment sought by relator are not stated in the petition, and yet, in the absence of a clear showing to the contrary, it will be presumed that the refusal was right. This case is essentially different in that respect from *Butterworth* v. *Hoe, supra,* where the refusal

to perform the act sought was placed upon a single stated ground which was untenable, and the untenability of which was manifest as a matter of law without any inquiry into matters of fact.

Mr. Justice MORRIS delivered the opinion of the Court:

By a long and well-known series of cases in the Supreme Court of the United States, from that of *Marbury* v. *Madison,* 1 Cranch, 137, to that of *Roberts* v. *United States,* 176 U. S. 221, the law of *mandamus* has been well settled, so far as it concerns the authority of the courts of the District of Columbia to issue that writ to the head of a department of the Federal Government or the chief of a bureau upon whom some special duty has been devolved by law. These decisions have firmly established the doctrine that the writ of *mandamus* will be issued to compel the performance of a ministerial duty by such officer, but that it will be refused when the duty required of him involves the exercise of judicial or quasi-judicial discretion. The only difficulty in any given case now is the application of the doctrine, and the determination of the question whether the act of which the performance is sought, is of a ministerial or of a judicial character. That question is greatly simplified in the present case by the concession of the demurrer of the appellee that the facts stated by the relator in his petition and which constitute the foundation of the relator's cause of action, are true as therein stated.

It is conceded that the relator has taken all the steps and complied with all the requirements of the law to entitle him to his allotment; and it is not controverted that he is a proper person to receive the allotment. It is true that he is not a native member of the Indian tribe, but only an adopted member. But no question is made as to this either in the brief or in the oral argument on behalf of the appellee, and none well could be made in view of the well-established custom of the Indians for over two hundred and fifty years to admit white men into membership of their

several tribes by the process of adoption, and in view of the uniform recognition of this custom by the Government of the United States. The sole defense interposed by the appellee to the relator's right in the premises is the proposition that the cause is one wherein the Secretary of the Interior was required to exercise judgment and discretion, that the control of Indian affairs is a political function vested by Congress in the Executive branch of Government, that the power to approve in this instance involved the power to disapprove, that this necessarily implies the exercise of judgment, that the refusal of the Secretary to approve the allotment amounts to a disapproval and rejection of it, and that any attempt to control his judgment therein would be an exercise of appellate power which is not given to the courts.

We think that this proposition in the present case is based upon a misapprehension of the law and cannot be sustained.

The fact that an act which *mandamus* seeks to compel is the culmination of a series of proceedings of a judicial or quasi-judicial nature, or is an act in the course of such proceedings, does not exempt it from judicial control by the courts through the writ of *mandamus,* when the officer or person charged to perform it, arbitrarily and without just legal cause refuses such performance. This is so even in reference to strictly judicial proceedings. For a trial court to settle a bill of exceptions or to approve an appeal bond is a judicial function requiring the exercise of judgment and discretion; and yet, if the judge holding the trial court arbitrarily refuses to settle such bill of exceptions, when in due form it has been duly tendered to him, or arbitrarily refuses to approve such appeal bond, when it has been duly submitted to him for approval and is in all respects satisfactory and subject to no reasonable objection, it is elementary law, which requires no elaboration and no citation of authority for its support, that, while his judgment may not be coerced, the performance of his duty may be required of him by means of the writ of *mandamus.* Indeed, it may be laid down as a general rule, that, while the judg-

ment of a judicial officer or of an officer charged with the performance of a judicial or quasi-judicial duty, will not be controlled through the writ of *mandamus*, and this writ will not be used as a means for the review of the exercise of such judgment, yet any act required by law to be done, whether in the course of judicial proceedings or otherwise, may be compelled by *mandamus* from a superior tribunal, or a tribunal of general jurisdiction, as the case may be, when its performance is withheld by a mere arbitrary exercise of power without just cause. There is not a step in the course of judicial proceeding which may not be the subject of *mandamus*, when its performance is unlawfully refused.

Now, if this be the case in strictly judicial proceedings, it is even more so in regard to the functions of executive officers in the performance of acts wherein individual citizens are interested. To grant a patent for lands, or for an invention in the arts or for a discovery in the sciences, is a quasi-judicial function of the highest nature, which has been committed by Congress to the executive officers of the Government; and the granting or refusal of such a patent ordinarily cannot be questioned in the courts. But when all the proper prerequisites have been complied with, and all the preliminary steps have been taken whereby a party has in law become entitled to a patent, and nothing remains to be done but to issue the patent, it is well settled that such patent may not then arbitrarily and without just cause be withheld, and that its execution and delivery may be enforced by the writ of *mandamus*. *Butterworth* v. *Hoe*, 112 U. S. 50; *United States* v. *Schurz*, 102 U. S. 378; *Dunlap* v. *Black*, 128 U. S. 40. It has been well said that, under our republican system of government, there is no place for the exercise of arbitrary power.

It is not to be denied that, in the administration of the law the provisions of which it is sought here to enforce, a certain amount of discretion is reposed in the Secretary of the Interior and the officers of the land office under his control. But that discretion has been expended. It is con-

ceded by the pleadings in this case that the relator has done everything required by the statute to be done by him; that he is a proper person to receive the allotment which he seeks; that his selection of land is right and proper; that such selection infringes no other right, and that there is no reason whatever why his selection should not be approved. We may infer, of course, that there is some secret reason for disapproval not disclosed in the record; but if such secret reason there be, the courts can take no cognizance of it. The only ground whatever of objection set up to the writ is, that the case is one involving the exercise of judgment and discretion on the part of the Secretary. But the plain answer to this argument is that the judgment and discretion have been exercised, and that the only thing which now remains to be done is the final expression of that judgment, as in the case of *Butterworth* v. *Hoe, supra,* by the execution and delivery of a certificate of approval, which, in contemplation of law, is a purely ministerial duty.

It is not sought to control the judgment of the Secretary in any matter calling for the exercise of judgment. It was for him to determine whether the relator was within the category of persons entitled to an allotment of land, whether the land selected was of the kind which the relator was entitled to select, whether it interfered with the rights of any other persons, and all other preliminary matters going to the validity or invalidity of the relator's action. But it is admitted by the pleadings that all this was done, and that no question whatever in that regard remains to be determined; and the legal interpretation of the action of the department is that, although the relator has been adjudged to be entitled to receive his allotment, approval is arbitrarily withheld and no cause whatever is assigned for the refusal — not even a plausible, although insufficient cause, as in the case of *Butterworth* v. *Hoe.*

Now, if in the case of an appeal bond, it were admitted that the bond were regular and sufficient in every respect and that the sureties were satisfactory, and the sole ground for withholding refusal was that the judge had the power

to approve or disapprove, and therefore an exercise of discretion in the matter, we apprehend that he could be required by *mandamus* to give his approval. And we find no greater amount of discretion involved in the duty which is sought to be enforced here.

The history of adjudication on the subject of *mandamus* is sufficient to show that the courts should be cautious not to interfere with the independent freedom of action guaranteed by the Constitution and the laws to the executive officers of government; but it is also sufficient to show that the writ of *mandamus* will be freely resorted to in order to enforce individual right against arbitrary action, however well intended such action may be, when the relator has no other available remedy. *Roberts* v. *United States*, 176 U. S. 221.

In view, therefore, of the concessions made by the demurrer in this case, we must reverse the order appealed from, and remand the cause for further proceedings therein according to law.

But it is proper here to state that we cannot commend the practice, which has lately grown up in the District, of making return to a writ of *mandamus*, or rule to show cause why the writ of *mandamus* should not issue, by a demurrer to the petition upon which the writ or rule to show cause has been issued. This practice, although in accordance with that of several of the States of our Union, is not wholly consistent with the provisions of the Statute of 9 Anne, Ch. 20, regulating the proceedings in *mandamus*, the substance of which, it may be noted, has been embodied in the new code for this District, Secs. 1273–1282. The act of Anne, equally with the new code, contemplates a *return* or answer to the writ, not a demurrer to the petition; and it contemplates that in this return or answer all the facts shall be stated upon which the respondent proposes to rely. It does not contemplate that he shall keep back any of the facts, by relying first on a demurrer to the petition and then falling back upon an answer, which would be proper enough in ordinary cases, but not in proceedings in *mandamus*.

Logically, the rule to show cause is not answered by demurring to the petition in pursuance of which the rule has been issued.   The petitioner may plead to or traverse the return; and his pleading may take the shape of a demurrer; and there may be a replication and demurrer to a plea or replication; but a demurrer would seem to have no proper place in the proceedings until the coming in of the return to the rule to show cause.

The return should be an answer or statement of facts showing the grounds upon which the respondent has acted or refused to act.   It may state the facts in part or in whole by denying or admitting the allegations of the petition, or by qualifying or explaining them; but it should in some way state all the facts necessary and proper for the determination of the cause.

If this course had been pursued in the present cause, it would have been unnecessary to send the cause back for further proceedings.   We have now no option but to do so.

The order appealed from will therefore be *reversed, with costs; and the cause will be remanded to the Supreme Court of the District of Columbia, with directions to overrule the respondent's demurrer, and for further proceedings therein according to law.   And it is so ordered.*