# GARFIELD v. UNITED STATES EX REL. GOLDSBY.

OFFICERS; STATUTES; INDIANS; MANDAMUS.

1. When the judgment or discretion of an executive officer has been completely exercised in the performance of a specific duty, the act performed is beyond his review or recall, unless power to that extent has also been conferred upon him. (Following *United States ex rel. West* v. *Hitchcock*, 19 App. D. C. 333, and *Garfield* v. *United States ex rel. Frost*, ante, 165.)

2. A section of a statute must be considered as a whole, to arrive at its meaning.

3. Where, under the various statutes providing for the enrolment of the members of the "Five Civilized Tribes" of Indians, and the allotment to them of their lands in severalty, and the distribution among them of tribal funds, the Secretary approves one of the rolls of names sent him from time to time by the Commission for preparing the rolls, he has no right to erase the name of an individual from such roll, without notice to him, on the last day within which, under the law, any enrolment can be made, even though such individual has no vested interest, but only a mere expectancy, in the pecuniary benefits accruing from such enrolment; and in the absence of any other legal remedy, mandamus at the instance of the party so injured will lie to compel the Secretary to undo his action by restoring the name to the roll. (Following *United States ex rel. Romero* v. *Cortelyou*, 26 App. D. C. 298; *United States ex rel. Daly* v. *Macfarland*, 28 App. D. C. 552.)

No. 1829.  Submitted November 6, 1907.  Decided November 29, 1907.

HEARING on an appeal by the Secretary of the Interior from an order of the Supreme Court of the District of Columbia granting the writ of mandamus to compel him to restore the name of the relator to the approved rolls of the members of the Chickasaw Nation.                     *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from an order of the supreme court of the District of Columbia granting a writ of mandamus to compel the appellant, James Rudolph Garfield, Secretary of the Interior, to erase certain marks upon the approved rolls of members of the Chickasaw Nation, striking the name of relator therefrom, and to restore the name of relator, John E. Goldsby, to said roll.

There is no controversy in respect of the facts involved. Prior to October 26, 1905, the Commission to the Five Civilized Tribes certified to the Secretary of the Interior a list of the names of persons that had been to that date enrolled as entitled to membership of the Chickasaw Nation, for the purpose of the allotment of lands and the distribution of tribal funds, under the provisions of the acts of Congress providing therefor. On October 6, 1905, the Secretary of the Interior affirmed the act of the Commission enrolling the relator, and on April 26, 1906, reported his approval to the Commission. The roll, as approved, was kept in the Secretary's office, and copies sent as directed by the law. Thereafter relator selected land and was awarded a certificate of allotment by said Commission; but no patent has been issued. On March 4, 1907, the Secretary of the Interior, without notice to or knowledge of the relator at the time, erased the name of relator from the said roll in his office, and caused an entry to be made opposite his name as follows: "Canceled March 4, 1907." No erasure was made on the duplicate copies. Upon learning this fact, on April 6, 1907, the relator made a demand upon the Secretary that he should erase or cause to be erased the line that had been drawn across the entry of his enrolment, as well as the entry of cancelation aforesaid. The erasure had been made by order of Secretary Hitchcock, and the demand was made upon his successor, the appellant, who found the roll in the condition mentioned, upon his assumption of the office of Secretary of the Interior. The secretary claims exclusive jurisdiction in the matter of making and approving the tribal rolls and allotments

thereunder, and the power thereunder to recall his former approvals of membership enrolments up to and including March 4, 1907, the day fixed for the final closing of enrolment. The answer of appellant shows that his predecessor had stricken many names from the approved rolls from time to time, and stated that there was no regulation requiring the giving of notice in such cases. He further says that he is advised that his predecessor for a time exercised his right to strike names from the rolls without notice, but that about three years before March 4, 1907, he had followed the practice of giving notice to parties, and affording them an opportunity to be heard; but that on account of the fact that the final completion of the rolls could not be delayed beyond the date fixed by law therefor, namely, March 4, 1907, no such notice could be given to the relator. Without reciting the many acts of Congress relating to the Five Civilized Tribes, it is sufficient to say that the act of March 3, 1893, creating the "Dawes Commission," contemplated the ultimate creation of a State or States which should embrace the lands within the Indian Territory, where the tribes aforesaid were then living. From that time on, various statutes were enacted providing for the enrolment of the actual members of the several tribes, and the allotment of their lands to enrolled members in severalty, as well as the distribution among members of accumulated and accumulating tribal funds. The act of June 10, 1896, directed the "Dawes Commission," whose official designation was the "Commission to the Five Civilized Tribes," to make up a complete roll of members of the several nations; and as a part thereof confirmed the rolls of citizenship of the several tribes then existing. Persons whose names were not upon said rolls were authorized to make application for enrolment. If either such applicant or the tribe should be aggrieved by a decision entering such applicant upon the roll, an appeal was authorized to be taken within sixty days to the United States court in the Territory, whose judgment therein was declared final. The complete rolls as made up by the Commission were to be lodged with the Commissioner of Indian Affairs after six months, to remain for use as the final

judgment of the duly constituted authorities. The Dawes Commission, it seems, did not adopt the former tribal rolls without question, but proceeded to try the rights of persons thereon; and much litigation followed. The act of June 7, 1897, declared that the rolls confirmed meant the last authenticated rolls of each tribe, that had been approved by the council of the several nations, and the descendants of those appearing on such rolls, with such additional names as may have been added either by the councils, the courts or the Dawes Commission under the act of June 10, 1896. The Commission was given the right to investigate all other names, and, after notice and opportunity to be heard, to strike them from the rolls, with right of appeal to the United States court. All matters relating to the tribes were again provided for by the "Curtis act" of June 28, 1898, which is comprehensive and sweeping in its character. This reduced the confirmed rolls, and directed the Dawes Commission to investigate all other rolls, and omit any persons placed thereon by fraud or without authority of law. It was directed to make correct rolls, which, when approved by the Secretary of the Interior, shall be final; and such persons shall alone constitute the several tribes represented. Acts of May 31, 1900, and March 3, 1901, made some further provisions, not important to be mentioned; and the last act directed the Secretary to fix a time for closing the enrolment. A later act (April 26, 1906) provided that the rolls of the tribes shall be fully completed on or before March 4, 1907, and the Secretary shall have no jurisdiction to approve the enrolment of any person after that date (34 Stat. at L. 137, chap. 1876). The act of July 1, 1902 (32 Stat. at L. 641, chap. 1362), ratifying an agreement between the United States and the Choctaw and Chickasaw Nations (of which the relator claims membership), provided that the enrolment of their members should be made in strict compliance with the provisions of the acts of June 28, 1898, and May 31, 1900, and that no person claiming right to enrolment by virtue of a judgment of a United States court, and whose right may be contested by proceedings under this agreement, shall be enrolled until his right has been finally determined.

Sec. 30 of the agreement, as recited in the act aforesaid, reads as follows:

"30. For the purpose of expediting the enrolment of the Choctaw and Chicksaw citizens and the Choctaw and Chickasaw freedmen, the said Commission shall, from time to time, and as early as practicable, forward to the Secretary of the Interior lists upon which shall be placed names of those persons found by the Commission to be entitled to enrolment. The lists thus prepared, when approved by the Secretary of the Interior, shall constitute a part and parcel of the final rolls of citizens of the Choctaw and Chickasaw tribes and of Choctaw and Chickasaw freedmen, upon which allotment of land and distribution of other tribal property shall be made as herein provided. Lists shall be made up and forwarded when contests of whatever character shall have been determined; and when there shall have been submitted to and approved by the Secretary of the Interior lists embracing names of all those lawfully entitled to enrolment, the rolls shall be deemed complete. The rolls so prepared shall be made in quintuplicate, one to be deposited with the Secretary of the Interior, one with the Commissioner of Indian Affairs, one with the principal chief of the Choctaw Nation, one with the governor of the Chickasaw Nation, and one to remain with the Commission to the Five Civilized Tribes."

Whether the relator's name appeared upon the original tribal roll, or was added thereto upon application, does not appear; but it is admitted that he was duly and finally enrolled as a member by the Dawes Commission, and his name certified to the Secretary upon one of the lists or parts of the roll sent up under the section aforesaid. No objection appears to have been made to his right to membership, and his enrolment was regularly and formally approved, and notice thereof given to the Commission. Acting upon this as final, the Commission issued relator's certificate of allotment. Sec. 23 of the act of July 1, 1902 (32 Stat. at L. 641, chap. 1362), made this certificate conclusive evidence of the allottee's right to the land described therein.

By virtue of his enrolment the relator became entitled to share in the distribution of the tribal funds, also provided for in the statutes, which has not yet been made in full.   It is conceded that, in addition to issuing certificates of allotment upon the lists or partial rolls returned by the Secretary as approved, it has been the practice of the Indian agents charged with that duty to distribute part of such funds to such approved members. And in this, or one of the other cases submitted with it, it was admitted that the enrolled member, whose name has been erased from the Secretary's copy of the rolls, was allowed to participate in one of these partial distributions of the fund.

*Mr. Edward T. Sanford,* Assistant Attorney General, and *Mr. William R. Harr,* Special Assistant to the Attorney General, for the appellant.

*Messrs. Kappler & Merillat* and *Mr. James K. Jones* for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

We consider it unnecessary to review the cases cited on the argument relating to the plenary power of Congress over the lands of the Indians and their allotment, and to the comprehensive powers conferred upon the Secretary of the Interior in regard to all matters of administration relating to the same subjects.   It is sufficient to say that we recognize to the fullest extent this power of Congress, as well as those intrusted to the Secretary of the Interior, and concede that, in the performance of the onerous duties confided to the discretion of the Secretary, his decisions are not subject to judicial review.   One of the most important and onerous of those duties was that of examining the lists or rolls of membership of these five large tribes when reported to him as finally determined by the Commission.   In its performance he could disapprove and strike names from the

list, and approve others. No court was vested with the power, by appeal or otherwise, to review his decisions in either case.

It is equally well settled, on the other hand, that, when the judgment or discretion of an executive officer has been completely exercised in the performance of a specific duty, the act performed is beyond his review or recall, unless power to that extent has also been conferred upon him. *United States ex rel. West* v. *Hitchcock,* 19 App. D. C. 333, 345; *United States* v. *Schurz,* 102 U. S. 378, 26 L. ed. 167; *Butterworth* v. *United States,* 112 U. S. 50, 28 L. ed. 656, 5 Sup. Ct. Rep. 25; *Garfield* v. *United States,* Present Term [ante, 165].

It remains to consider whether the Secretary's discretion had been completely exercised and his power exhausted when he gave his approval to the relator's enrolment, and reported that approval to the Commission, as shown in this case. The determination of this question depends upon the meaning of sec. 30 of the act July 1, 1902, heretofore set out. It was well known to Congress that the tribes were composed of thousands of undoubted members, and that many others, perhaps thousands, claimed membership. It was known, when the first act looking to allotment of these lands was enacted, that the ascertainment of the true membership of these tribes would require time and be attended with contests. Before the enactment of the act of July 1, 1902, experience had demonstrated the justice of this apprehension; and thereafter, as we have seen, the time of final completion of the rolls of membership had to be extended until March 4, 1907. Necessarily, the Commission charged with the duty, in the first instance, of preparing the rolls, would have to consider one by one the names of applicants when the facts of their cases were prepared for determination. For the purpose of expediting this enrolment, as the statute declares, the Commission was not directed to complete the work as a whole, but "from time to time, and as early as practicable, forward to the Secretary of the Interior lists upon which shall be placed the names of those persons found by the Commission to be entitled to enrolment." And it is further provided that "the lists thus prepared, when approved by the Secretary of

the Interior, shall constitute a part and parcel of the final rolls of citizens of the Choctaw and Chickasaw tribes and of Choctaw and Chickasaw freedmen, upon which allotment of land and distribution of other tribal property shall be made as herein provided." It is admitted that there was no question but that the lands were ample to satisfy all probable claims to the extent provided for each individual allotment, and that there was no danger of exhaustion of the funds which were to be distributed in part to each member then or thereafter to be enrolled. These facts were, of course, well known to the parties entering into the agreement, and to Congress when that agreement was embodied in the statute. The contention of the relator is that each roll so approved became final, under the terms of the law, without waiting for the date fixed until the final closing of the enrolment. That this was the construction given to the section by the Secretary of the Interior is evidenced by the fact that he certified his approval of the sections of the rolls from time to time submitted, sometimes striking therefrom the name of a person whose enrolment he disapproved. A copy of the list was retained by him, and others delivered to the Commission, to the Commissioner of Indian Affairs, and to the chiefs of the two nations. Upon these approved lists the Commission proceeded to make allotments, and the Indian agents distributed a portion of the funds in hand. These agents were under the control of the Secretary of the Interior. Many of these allotments passed to patents, which were delivered with the approval of the Secretary. On March 4, 1907, the day on which all authority to enroll members ended, the then Secretary, who shortly thereafter resigned his office, undertook to cancel approvals that had been made, by erasing relator's name, with others, from the approved list remaining in his custody. The contention for the authority to do this is founded upon a succeeding paragraph of the section, which reads as follows: "Lists shall be made up and forwarded when contests of whatever character shall have been determined; and when there shall have been submitted to and approved by the Secretary

of the Interior lists embracing names of all those lawfully en-
titled to enrolment, the rolls shall be deemed complete."

We think that the Secretary's first construction of the entire
section—which must be considered as a whole to arrive at its
meaning—was the correct one. Especially when we take into
consideration the conditions before stated, the plain intention
of the framers of the agreement and of Congress seems to have
been that this final roll, to be completed and ended on or before
March 4, 1907, should be made up and approved in section for
convenience and despatch. By this means only, could sufficient
time and opportunity be given each claimant for the assertion
of his rights either before the Commission or the Secretary.
We cannot conceive that either the contracting parties or Con-
gress contemplated a power in the Secretary, after having ap-
proved the rolls in sections from time to time, to strike down the
whole list of enrolment, or erase any number of names there-
from, on the last day within which any enrolment could be made
by him or any other authority. Action of this kind could only
be taken, as it was, without notice to a party whose rights, or
expectations, if they are to be called such only, were thus at-
tempted to be destroyed.

It is quite true that individual members of the Indian tribes
had no vested rights in the lands by virtue of enrolment only,
and that their allotment was entirely within the unlimited pow-
ers of Congress; yet these powers had been exercised only after
a solemn agreement with the tribes. And even if the individual,
after his enrolment had been approved, had nothing more than
a mere expectancy, that expectancy represented something of
considerable pecuniary value; and the power to destroy that
reasonable expectancy, without notice and opportunity to de-
fend it, is so opposed to the genius of our institutions that it
ought not to be inferred to exist. Nothing less than the plain
provision of an imperative law would seem to warrant it.

The appellant relies further upon the act of April 26, 1906
(34 Stat. 137, chap. 1876), as conferring, by implication, the
power upon the Secretary of the Interior to strike the name of
the relator from the roll after approval. Sec. 2 of this act, as

before stated, requires that the rolls shall be fully completed on or before March 4, 1907, and prohibits the Secretary from approving the enrolment of any person after said date. Sec. 4 permits the transfer, under certain conditions, of a person from the approved roll of freedmen to that of citizens by blood. Sec. 5 provides that all patents to allottees shall be recorded in the office of the Commissioner, "and when so recorded shall convey legal title, and shall be delivered, under the direction of the Secretary of the Interior, to the party entitled to receive the same." Sec. 6 provides for the removal, by the President, of principal chiefs of the nations who shall refuse or neglect to perform the duties imposed upon them. Their duty under the former statute was to execute patents to allottees holding certificates from the Commission. The same section also provides, in case of the failure of said chiefs to execute a patent for thirty days after notice that the same is ready for signature, that such patent may be approved by the Secretary without such execution, and when so approved and recorded shall convey legal title.

We see nothing in this statute enlarging the powers of the Secretary, save under the conditions expressly provided for. The power given to transfer a freedman to the citizenship roll is limited thereto. The transfer, which increases his allotment, is for his advantage, and does not infringe the legal rights of other members. This power to add names under certain conditions does not include the power to strike a name from the citizenship roll. The strictly limited power of transfer from the freedman's roll to that of citizenship by blood, before March 4, 1907, does not confer the power to cancel the approval of the latter roll, previously given. The natural inference is against the exercise of the further power.

Entertaining the opinion that the Secretary had no power to cancel his approval and remove relator's name from the roll at the time and in the manner stated, the further question is presented: Is it within the judicial power to compel him to undo his action by removing his entry of cancelation and restoring the name to the roll?

Conceding that mandamus will not ordinarily lie to compel

the undoing of an act, it is clear that the doctrine has some necessary limitations. In the first place, it has not been suggested, nor can we perceive, that there is any other legal remedy for the relief of the relator from the consequences of the injury that has been done him. A cloud has been cast upon his right to the land allotted to him, that will prevent his obtaining his patent; and his right to share in the distribution of the tribal funds, dependent upon his recognized enrolment, has been impeded, if not finally destroyed These conditions have been brought about solely by the failure and refusal of the Secretary to give effect to, and enforcement of his former decision that has been held to be final and beyond the power of review or recall. Unless the writ of mandamus can be issued, the mischief is wholly without judicial remedy. That it will issue in such a case as here presented, to undo an unlawful act and restore a former condition, is, in our opinion, well settled. *Stafford* v. *Union Bank,* 17 How. 275, 282, 10 L. ed. 101, 102; *Ex parte Dubuque & P. R. Co.* (*Dubuque & P. R. Co.* v. *Litchfield*) 1 Wall. 69, 73, 17 L. ed. 514, 515; *United States ex rel. Romero* v. *Cortelyou,* 26 App. D. C. 298, 301; *United States ex rel. Daly* v. *Macfarland,* 28 App. D. C. 552.

In *Stafford* v. *Union Bank, supra,* the United States court for the district of Texas had rendered a decree for the payment of money, and the judge had thereafter granted an appeal with supersedeas upon wholly inadequate bond. Having held that this bond did not have the legal effect to supersede the execution of the decree, the court issued an order compelling the judge to carry the decree into effect. See also *Stafford* v. *New Orleans Canal & Bkg. Co.* 17 How. 283, 15 L. ed. 102. In the *Dubuque & P. R. Co.'s* Case the Supreme Court had reversed a judgment of the district court of Iowa, and directed a judgment for the defendant. Upon return of the mandate a judgment was entered in accordance therewith. Thereafter the court, upon the affidavits of ability to show new facts, granted a new trial. The judge was compelled by mandamus to erase and vacate the order granting the new trial, and execute the judgment. In *United States ex rel. Romero* v. *Cortelyou, supra,* the Postmaster Gen-

eral was compelled to re-establish a postoffice that had been abolished.    In *United States ex rel. Daly* v. *Macfarland,* the Commissioners of the District of Columbia were ordered to vacate the revocation of a plumber's license, and restore his status.    The facts of this case bring it under the principle governing those cases, and the one last cited is directly in point.

We are of the opinion that the court was right in ordering the appellant to erase the entries upon the roll and restore relator's name thereto; and the judgment must therefore be affirmed, with costs.    It is so ordered.                         *Affirmed.*

A writ of error to the Supreme Court of the United States was allowed January 6, 1908.